**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

DELANEY G. MARKS,

*Petitioner-Appellant*,

v.

RONALD DAVIS, Warden,
California State Prison at San Quentin,

*Respondent-Appellee*.

No. 17-99007

D.C. No. 5:11-cv-
02458-LHK

OPINION

Appeal from the United States District Court
for the Northern District of California
Lucy H. Koh, District Judge, Presiding

Argued and Submitted December 14, 2022
Pasadena, California

Filed July 8, 2024

Before: Mary H. Murguia, Chief Judge, and Marsha S.
Berzon and Ryan D. Nelson, Circuit Judges.

Opinion by Judge Murguia;
Partial Concurrence and Partial Dissent by Judge Berzon;
Partial Concurrence and Partial Dissent by Judge R. Nelson

# SUMMARY[*]

## Habeas Corpus / Death Penalty

The panel affirmed in part and vacated in part the district court's judgment denying a federal habeas petition filed by Delaney Marks, who was convicted of murder and sentenced to death in California in 1994; and remanded.

In Part I, the panel held that the district court properly denied relief on Marks's claim that he was incompetent to stand trial. Although Marks presented substantial evidence of incompetence, there was a reasonable basis in the record for the California Supreme Court to deny this claim. Considering the record as a whole, the California Supreme Court's adjudication of this claim was not so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

In Part II, the panel held that the district court erred by denying relief on Marks's claim that he is intellectually disabled and thus ineligible for the death penalty under *Atkins v. Virginia*, 536 U.S. 304 (2002). Marks has shown that the California Supreme Court's rejection of this claim was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. The state court rejected the opinions of two of Marks's experts, Dr. Cowardin and Dr. Woods, on the strength of factual findings that were erroneous, objectively unreasonable, and material to the outcome of the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

proceedings. Accordingly, the panel vacated the judgment in part and remanded to the district court for *de novo* review of this claim.

In Part III, the panel held that the district court properly denied relief on Marks's claim that the judge adjudicating his *Atkins* claim was biased against him. The California Supreme Court reasonably could have concluded that the judge did not display a deep-seated favoritism or antagonism that would make fair judgment impossible. There was therefore a reasonable basis for the state court to reject this claim.

In Part IV, the panel held that the district court properly denied relief on Marks's claim that he did not knowingly waive his Fifth Amendment right not to testify at trial. The California Supreme Court reasonably could have concluded from the transcript that Marks fully understood the consequences of his decision. There was therefore a reasonable basis for the state court to reject this claim.

In Part V, the panel held that the district court properly denied relief on Marks's first ineffective assistance of counsel claim. Marks contended that his attorneys should have sought funding to retain a mental health expert during trial to opine on his mental competence. He argued that an expert would have concluded that he was incompetent and that this finding would have prompted a second competency hearing at which he would have been found incompetent to stand trial. The California Supreme Court reasonably could have concluded that a second competency hearing would have reached the same conclusion as a jury which had already found Marks competent. The state court therefore reasonably could have concluded that Marks failed to demonstrate a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different.

In Part VI, the panel held that the district court properly denied relief on Marks's second ineffective assistance of counsel claim relating to trial counsel's failure to object to false or misleading statements made by the prosecution during penalty-phase closing argument. The panel granted a certificate of appealability on this claim, but agreed with the district court that Marks neither exhausted this claim in the California courts nor adequately pleaded the claim in his federal petition.

Judge Berzon concurred in part and dissented in part. She joined the majority in reversing the district court's decision rejecting Marks's *Atkins* claim and concurred in remanding to the district court on that issue. She wrote that the state court's treatment of both Dr. Cowardin and Dr. Woods evinces a pattern of mischaracterization and bias in assessing the testimony of Marks's expert witnesses, and that this pattern extends to the state court's treatment of Marks's third expert witness, Dr. Gur. She explained why the relevant record for *de novo* review should include Dr. Gur's expert evidence, as well as some additional material. She therefore dissented from portions of Part II of the majority opinion, including those that discuss the treatment of Dr. Gur's credibility. She concurred in Parts I, III, IV, V, and VI of the majority opinion.

Judge R. Nelson concurred in part and dissented in part. He concurred in Parts I, II(A), II(C), and III-VI of the majority opinion. He disagreed with the conclusion in Part II(B) that the record as it relates to Dr. Cowardin and Dr. Woods suggests Marks may be intellectually disabled and thus ineligible for the death penalty. He wrote that a

properly deferential analysis establishes that the trial court's technical misstatements were not material and capable of rendering its credibility determinations objectively unreasonable, but were inconsequential. He wrote that properly applying precedent, the record as a whole supports the trial court's factual determinations, and that the majority's approach conflicts with the purpose of AEDPA.

## COUNSEL

Gary D. Sowards (argued), McBreen & Senior, Los Angeles, California; Cliona R. Plunkett, and Caroline P. Cincotta, Habeas Corpus Resource Center, San Francisco, California; for Petitioner-Appellant.

Sarah J. Farhat (argued), Deputy Attorney General; Alice B. Lustre and Glenn R. Pruden, Supervising Deputy Attorneys General; Ronald S. Matthias and James W. Bilderback II, Senior Assistant Attorneys General; Gerald A. Engler, Chief Assistant Attorney General; Xavier Becerra, California Attorney General; Office of the California Attorney General, San Francisco, California; for Respondent-Appellee.

**OPINION**

MURGUIA, Chief Circuit Judge:

Petitioner Delaney Marks was convicted of murder and sentenced to death in 1994. After pursuing postconviction review in the California courts, he filed a federal habeas petition under 28 U.S.C. § 2254. The district court denied relief, and Marks timely appeals, raising six claims. We affirm in part, vacate in part, and remand.

In Part I, we hold that the district court properly denied relief on Marks's claim that he was incompetent to stand trial. Although Marks presented substantial evidence of incompetence, there was a reasonable basis in the record for the California Supreme Court to deny this claim. *See* 28 U.S.C. § 2254(d); *Harrington v. Richter*, 562 U.S. 86, 98 (2011). A jury unanimously found that Marks was competent. The state trial court judge was firmly convinced that Marks was competent. The state court reasonably could have concluded from Marks's conduct and testimony at trial that he understood the proceedings and was capable of assisting counsel. The contrary opinions of Marks's attorneys were "not determinative." *Miles v. Stainer*, 108 F.3d 1109, 1113 (9th Cir. 1997). Nor were the opinions of Marks's experts. Three of Marks's experts had testified at the competency trial, and the jury had rejected their opinions. And the remaining experts opined on Marks's competency eight or nine years after trial; such retrospective competency determinations are disfavored. *Williams v. Woodford*, 384 F.3d 567, 610 (9th Cir. 2004). Considering the record as a whole, the California Supreme Court's adjudication of this claim was not "so lacking in justification that there was an error well understood and comprehended

in existing law beyond any possibility for fairminded disagreement." *Woods v. Etherton*, 578 U.S. 113, 117 (2016) (per curiam) (quoting *White v. Woodall*, 572 U.S. 415, 420 (2014)).

In Part II, we hold that the district court erred by denying relief on Marks's claim that he is intellectually disabled and thus ineligible for the death penalty under *Atkins v. Virginia*, 536 U.S. 304 (2002). Marks has shown that the California Supreme Court's rejection of this claim was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The state court rejected the opinions of two of Marks's experts on the strength of factual findings that were erroneous, objectively unreasonable, and material to the outcome of the proceedings. Accordingly, we vacate the judgment in part and remand to the district court for de novo review of this claim.

In Part III, we hold that the district court properly denied relief on Marks's claim that the judge adjudicating his *Atkins* claim was biased against him. We recognize that the judge in question directed unusually sharp criticism at Marks's attorneys and witnesses and, in the majority's view, made significant factual errors. The California Supreme Court, however, reasonably could have concluded that the judge did not "display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994). There was therefore a reasonable basis for the state court to reject this claim. *See* 28 U.S.C. § 2254(d); *Harrington*, 562 U.S. at 98.

In Part IV, we hold that the district court properly denied relief on Marks's claim that he did not knowingly waive his Fifth Amendment right not to testify at trial. Before

allowing Marks to testify, the trial court engaged in an extensive colloquy with Marks and defense counsel to confirm that Marks understood his right to testify or to refuse to do so, as well as the consequences of his election. The California Supreme Court reasonably could have concluded from the transcript that Marks fully understood the consequences of his decision. There was therefore a reasonable basis for the state court to reject this claim. *See* 28 U.S.C. § 2254(d); *Harrington*, 562 U.S. at 98.

In Part V, we hold that the district court properly denied relief on Marks's first ineffective assistance of counsel claim. Marks contends that his attorneys should have sought funding to retain a mental health expert during trial to opine on his mental competence. He argues that an expert would have concluded that he was incompetent and that this finding would have prompted a second competency hearing at which he would have been found incompetent to stand trial. A jury, however, had already found Marks competent once. The California Supreme Court reasonably could have concluded that a second competency hearing would have reached the same conclusion. The state court therefore reasonably could have concluded that Marks failed to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984); *see* 28 U.S.C. § 2254(d); *Harrington*, 562 U.S. at 98.

Finally, we hold in Part VI that the district court properly denied relief on Marks's second ineffective assistance of counsel claim relating to trial counsel's failure to object to false or misleading statements made by the prosecution during penalty-phase closing argument. Although we grant a certificate of appealability on this claim, we agree with the district court that Marks neither exhausted this claim in the

California courts nor adequately pleaded the claim in his federal petition. The district court therefore properly declined to consider this claim.

In sum, we vacate the district court's denial of Marks's *Atkins* claim and remand for de novo review of that claim. We otherwise affirm.

## STANDARD OF REVIEW

"We review de novo the district court's denial of a habeas petition." *Gulbrandson v. Ryan*, 738 F.3d 976, 986 (9th Cir. 2013). "We also review whether a petitioner failed to exhaust state court remedies de novo." *Wooten v. Kirkland*, 540 F.3d 1019, 1023 (9th Cir. 2008).

Because Marks's petition was filed after April 24, 1996, our review is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Under AEDPA, federal habeas relief may not be granted unless the state court's adjudication of a claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

Under § 2254(d)(1), "clearly established" "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if

the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413.  A state court's decision involves "an unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decision but unreasonably applies that principle to the facts of the prisoner's case."  *Id.*  The standard under § 2254(d)(1) is "difficult to meet" and is satisfied only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents."  *Harrington*, 562 U.S. at 102.  A petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id.* at 103.  It is not enough that the state court decision was "incorrect or erroneous"; "[t]he state court's application of clearly established law must be objectively unreasonable."  *Lockyer*, 538 U.S. at 75.

Under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."  *Wood v. Allen*, 558 U.S. 290, 301 (2010).  State courts are accorded "substantial deference."  *Brumfield v. Cain*, 576 U.S. 305, 314 (2015).  "If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination."  *Id.* (alterations and internal quotation marks omitted) (quoting *Wood*, 558 U.S. at 301).  "This is a daunting standard—one that will be satisfied in relatively few cases."  *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004), *abrogated on other grounds as stated in*

*Murray v. Schriro*, 745 F.3d 984, 999–1000 (9th Cir. 2014). "[W]here the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to [a] petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable." *Id.* at 1001.[1]

When the last state court decision adjudicating a claim is unreasoned,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

*Wilson v. Sellers*, 584 U.S. 122, 125–26 (2018). Where there is no reasoned state court decision, "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington*, 562 U.S. at 98. "[A] habeas court must determine what arguments or theories . . . could have supported[] the state court's

---

[1] A material fact is "[a] fact that is significant or essential to the issue or matter at hand; esp., a fact that makes a difference in the result to be reached in a given case." *Fact*, Black's Law Dictionary (11th ed. 2019).

decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e Supreme] Court." *Id.* at 102.

A petitioner who satisfies § 2254(d)(1) or (d)(2) is entitled to de novo review of the merits of the claim. *See Kipp v. Davis*, 971 F.3d 939, 955 (9th Cir. 2020); *Maxwell v. Roe*, 628 F.3d 486, 494–95, 506 (9th Cir. 2010); *Frantz v. Hazey*, 533 F.3d 724, 735–37 (9th Cir. 2008) (en banc).

Finally, § 2254(e) states that a state court's factual findings are presumed correct:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

## DISCUSSION

### I.  COMPETENCY

Marks argues that he was denied his constitutional right against being tried and convicted while incompetent to stand trial. The district court denied this claim under § 2254(d). We affirm.

### A.  Background

On October 17, 1990, a man later identified as Marks entered a Taco Bell in Oakland, California and shot an

employee.  *People v. Marks*, 72 P.3d 1222, 1226–27 (Cal. 2003).  The employee was seriously injured but survived.  *Id.* at 1227.  A few minutes later, a man fitting Marks's description entered a nearby convenience store and shot two workers.  *Id.*  One of the victims died and the other was injured but survived.  *Id.*  A short time later, a man and a woman later identified as Marks and his girlfriend, Robin Menefee, took a taxicab from Oakland to Alameda.  *Id.* at 1227–28.  The cab driver was shot and killed.  *Id.* at 1228.  Police later identified Marks as the cab driver's shooter and alleged robbery as the motive.  *Id.*

The police took Marks into custody later that evening. *Id.*  He was in possession of a revolver at the time of his arrest.  *Id.*  During a recorded interview, Marks told the police that he had found the revolver two days earlier, *id.* at 1229, and denied any involvement in the shootings.  A police criminologist later linked the revolver to the shootings, although the police found no gunshot residue on Marks's person or clothing.  *Id.* at 1228–29.  Marks, who was born in 1956, was thirty-four years old at the time of the shootings.

The State charged Marks with two counts of first degree murder, two counts of attempted premeditated murder, and one count of robbery.  He was represented initially by public defenders Joseph Najpaver, Joseph McGrew, and Susan Sawyer.

Marks was dissatisfied with his attorneys, especially Najpaver, and brought several pretrial motions to replace Najpaver as counsel.[2]  Marks made a number of outlandish charges at the substitution of counsel hearings, accusing

---

[2] When these motions failed, Marks resorted to assaulting Najpaver for the purpose of obtaining new counsel.  That plan succeeded.

Najpaver of, among other things, discriminating against him on account of race, being in league with the prosecution, and hating him because of his supposed relationship with co-counsel Sawyer. Marks's dissatisfaction with his attorneys stemmed in part from his attorneys' unwelcomed advice that he consider a plea bargain—pleading guilty and agreeing to a sentence of life in prison without the possibility of parole—to avoid the death penalty. But Marks's motions for substitution of counsel began before his attorneys first initiated plea discussions with the State. Marks, who maintained his innocence throughout the proceedings, refused to consider a guilty plea.

During the substitution of counsel hearings, Marks frequently spoke from prepared notes and fell into repetitive speech patterns that he described as "brain sticking." Marks told the state trial court, for example, that he should be appointed substitute counsel because of:

> [i]neffective questioning of testifying witnesses on the stand [during the preliminary hearing] which was a disclose of my innocence. I experienced constant racial slander from Joseph Najpaver, too. I experienced—excuse me. I experienced constant racial slander from Joseph Najpaver, towards I am often addressed as whom—I am often addressed as a fool by Joseph Najpaver, who refused—who refused—who refused his open hand, who I am often addressed as a fool—I'm often addressed as a fool to Joseph Najpaver when I am refused his open-handed cons to conceal my innocence because he

feels his lawful tactics when word usage is above my capacity of understanding. . . .

This has been taking place one year. Joseph Najpaver and Joseph McGrew hate, secretly hate me for—Joseph Najpaver and Joseph McGrew secretly hate me for—Joseph Najpaver and Joseph McGrew secretly— Joseph Najpaver and Joseph McGrew secretly hate me—Joseph Najpaver and Joseph McGrew secretly hate me because he feels I am trying to take, take from him the married Miss Sawyer, Attorney at Law, from him.

The state trial court held a preliminary hearing in October 1991, a year after Marks's arrest. At the hearing, Marks repeatedly interrupted the proceedings when the State presented the testimony of his former girlfriend, Menefee. Marks's behavior prompted the prosecutor at the time, Kevin Ryan, to question Marks's mental competence. Ryan told the court that he had "some doubt under Penal Code Section 1368 as to the mental competency of Mr. Marks."[3] The trial

---

[3] At the time, California Penal Code section 1368 stated:

> (a) If, during the pendency of an action and prior to judgment, a doubt arises in the mind of the judge as to the mental competence of the defendant, he shall state that doubt in the record and inquire of the attorney for the defendant whether, in the opinion of the attorney, the defendant is mentally competent. If the defendant is not represented by counsel, the court shall appoint counsel. At the request of the defendant or his counsel or upon its own motion, the court shall recess the

court acknowledged Ryan's concerns and asked Najpaver for his "evaluation of your client, whether you think he is mentally competent or not." Following a recess, during which Najpaver consulted with Marks, the following exchange occurred:

> MR. NAJPAVER: In answer to the Court's question, your Honor, as the Court has seen and heard, obviously there are some problems. But I believe at this time we

---

proceedings for as long as may be reasonably necessary to permit counsel to confer with the defendant and to form an opinion as to the mental competence of the defendant at that point in time.

(b) If counsel informs the court that he believes the defendant is or may be mentally incompetent, the court shall order that the question of the defendant's mental competence is to be determined in a hearing which is held pursuant to Sections 1368.1 and 1369. If counsel informs the court that he believes the defendant is mentally competent, the court may nevertheless order a hearing. Any hearing shall be held in the superior court.

(c) Except as provided in Section 1368.1, when an order for a hearing into the present mental competence of the defendant has been issued, all proceedings in the criminal prosecution shall be suspended until the question of the present mental competence of the defendant has been determined.

Cal. Penal Code § 1368(a)–(c) (1991). The current version of the statute has been expanded to cover revocation proceedings for a violation of probation, mandatory supervision, post-release community supervision, or parole but is otherwise unchanged. *See* Cal. Penal Code § 1368 (2022).

> should attempt to proceed with this preliminary examination.
>
> THE COURT: All right. I'll reserve. I have not seen sufficient, in my own judgment, to make a determination. But if you feel he's competent to proceed, we will proceed. However, I reserve the right at a later time if I see anything further to make a referral [for a competency determination] on my own motion.

Najpaver later explained that he had considered Marks "barely" competent at the time of the preliminary hearing. Najpaver also drew a distinction between the competence required for a preliminary hearing and the competence needed for trial.

By January 1992, Najpaver no longer believed Marks was competent to stand trial. The defense moved at that time to suspend the proceedings for a competency determination, invoking Penal Code section 1368. The trial court agreed to the request, suspended proceedings, and appointed two psychiatrists to examine Marks and opine on his competency. After examining Marks, both court-appointed psychiatrists, Dr. Karen Gudiksen and Dr. Fred Rosenthal, informed the court that they believed Marks was incompetent to stand trial. The State, however, demanded a jury trial on the question.

The competency trial took place in July 1992. Marks, who bore the burden of proof, relied on the testimony of two of his attorneys, Najpaver and McGrew, each of whom said Marks was incompetent, and five mental health professionals.

The mental health professionals included three psychiatrists who testified that Marks was incompetent to stand trial.  The first, Dr. Rosenthal, testified that

> it was fairly clear that [Marks] was a man who was having mental problems.  He was quite scattered.  He would, at times in the interview, be able to attend what looked like in a rational fashion, but it was soon obvious that he could not control that and he very quickly lapsed into repetitive pressured speech that made little sense.
>
> He, at times, would become somewhat scattered, not focused on the material that we were discussing.  He had a number of rather unusual ideas about what was going on in his life.
>
> He didn't really understand his situation. He couldn't really tell me clearly what the charges were that he was being held on.  He had some idea of charges that really didn't relate to the seriousness of the charges that he was being held on. . . .  [H]e thought there was something to do with possession of a weapon and that was all.  In his mind, this was the sense of why he was in prison, in jail. And when I tried to talk to him about what he was really charged with, he essentially denied those things and said he didn't think that was true, and denied the fact that it was written down as charges against him.

> He was quite paranoid. That is, he was quite suspicious and rather unrealistic about his attorneys and about the court system and about what was going on in his legal situation. . . . [H]e felt, for example, that his attorney was working with the district attorney, that they had made a deal to convict him and that there was no—he said there was no chance . . . of getting any kind of trial because this deal had already been made. . . . [H]e felt that the Judge and the whole system was involved in that and that this had been sort of a foredrawn conclusion and that "they were all out to get him," that was his words.

Dr. Rosenthal said that Marks "was not willing to even accept the idea that he was being charged with murder." In Dr. Rosenthal's view, "it was clear that [Marks] did not have the kind of control where he could concentrate and attend to a prolonged situation, complicated situation like a trial, and really understand what was going on."

On cross-examination, Dr. Rosenthal acknowledged that his examination of Marks had lasted only half an hour, that he did not conduct any neuropsychological testing that would have been helpful, that he was an opponent of the death penalty, that he had been unaware of the fact that Marks's attorneys were attempting to negotiate a plea deal— against Marks's wishes—by which Marks would plead guilty and spend the rest of his life in prison, that he could not rule out that possibility that Marks was lying to him, that he had testified dozens of times for the defense but not once for the State, and that he was being paid by the defense for his time as a witness.

Dr. Gudiksen also testified that Marks was incompetent to stand trial.  She had interviewed Marks twice for a total of about two hours.  She testified that:

> [I]n the first place, this written paper that he read to me on our first encounter was not terribly coherent and full of skulptified[4] and kind of confusing language.
>
> And then when we went—when I went back and was able to talk with him, this sort of confusing presentation continued off and on through the interview.  He was both confused and it was confusing to try to understand him.  There w[ere] gaps in his story.  He would repeat himself.  He would start and stop sentences.  He would say the same several words together and then repeat them in kind of—like he was stuck.
>
> There w[ere] some pauses in the interview like maybe he was paying attention to voices or something.  When asked if he was hearing voices, he said he was hearing them, although he didn't want me to think there were very many voices going on.
>
> He described various and sundry bodily symptoms in a rather bizarre way, like things were going on to his body that, to my physician ear, isn't the way certain symptoms are.  It was like bizarre and unusual and not

---

[4] So in the transcript.

> the description a patient would describe some particular ailment.

Dr. Gudiksen acknowledged that she had examined many defendants to determine their competency and most of the time had concluded that those defendants were incompetent to stand trial.  On cross-examination, she also acknowledged that she was opposed to the death penalty, that she had been unaware of Najpaver's attempts to negotiate a plea deal that would result in Marks spending the rest of his life in prison, that anger and resentment would be normal responses if a defendant insisted on his innocence but his attorneys were attempting to persuade him to plead guilty, and that she could not rule out the possibility that Marks was lying to her.  Dr. Gudiksen also testified that Marks understood the charges against him but did not think the charges had "anything to do with him."

The third psychiatrist, Dr. Jules Burstein, testified as a defense rebuttal witness.  Dr. Burstein had found Marks competent to stand trial in 1989, when Marks had been charged with grand theft.  At that time, Dr. Burstein had concluded that Marks was not psychotic; was malingering (i.e., pretending to be mentally ill); was unwilling, rather than unable, to cooperate with his attorneys; and was "quite competent" to stand trial.[5]

---

[5] A second psychiatrist, Dr. Hyman Silver, had also found Marks competent to stand trial in 1989.  Dr. Silver had concluded that Marks was "one who is capable of behavior which is offensive and disrespectful as well as showing poor judgment, but also is capable of remaining in and controlling both speech and physical movement when he is motivated or supportive."  He said that Marks was "quite capable of rational thinking despite that Mr. Marks has not always behaved

In 1992, by contrast, Dr. Burstein concluded that Marks was incompetent to stand trial. Dr. Burstein testified that Marks's thought processes were "scattered, tangential, . . . and occasionally . . . incoherent." He testified that Marks could not give the name of his attorney, Najpaver, and was unable to perform simple mathematical calculations. On cross-examination, Dr. Burstein acknowledged that Marks appeared lucid at times; that he, Dr. Burstein, was opposed to the death penalty; and that he was being paid by the defense for his testimony. He also disagreed with Dr. Gudiksen's opinion, recorded in a March 1992 report, that Marks was "unable to understand the nature of the proceedings against him."

In addition to the three psychiatrists, two other mental health professionals testified on Marks's behalf. Josalyn Harris, a vocational rehabilitation counselor at the Santa Rita Jail where Marks had been detained since October 1990, testified that Marks believed the "district attorney and the public defender [were] in collusion in trying to give him the death sentence." She noted that Marks's condition had deteriorated since she first began treating him in 1987 and that Marks's "ability to communicate his desires, his ability to communicate his feelings and focus on what his real concerns are have become very confused for him." Harris declined to give an opinion as to whether Marks was competent to stand trial. On cross-examination, she acknowledged that Marks knew he was facing serious charges, including the possibility of the death penalty. She

---

cooperatively, but he is apparently able to do so," and concluded that Marks was "fully aware of the nature and purpose of the proceedings taken against him and is able to cooperate in his own defense."

also acknowledged that Marks had been cooperative with jail staff.

Dr. David Stein, a clinical psychologist who had conducted neuropsychological testing on Marks as part of the defense's investigation of potential mental state defenses, testified that Marks had

> considerable pervasive brain imparity.
>
> There are some areas of his brain that are actually okay. . . . [H]e scores in a few areas in the normal range. But for the most part, he's anywhere from mildly to moderately to severely impaired depending on what part of the brain.
>
> This is fairly significant. And it can be surprising, because somebody can look normal, they can talk to you, and they don't look like they are impaired, but these are measures of different aspects of vision, of motor behavior, or thinking, of abstracting that he scores in impaired ranges with.

Dr. Stein was not asked to opine as to whether Marks was competent to stand trial. On cross-examination, Dr. Stein acknowledged that he had exclusively testified on behalf of the defense in other cases, that he was being paid by Marks's defense for his testimony, and that Marks had cooperated with him during the testing.

The prosecution presented no mental health experts to testify about Marks's competence but offered testimony from three Santa Rita Jail employees. Holly LaSalle, the jail's accounting supervisor and the custodian of inmate

financial accounts, said that Marks had consistently ordered items from the commissary in accordance with the balance in his account.  In July 1991, for example, Marks made a purchase for $6.90, leaving him with 12 cents in the account. In September 1991, Marks purchased $4.60 from the commissary, leaving him with nine cents in his account. This pattern continued through July 1992.

Sergeant Harvey Lewis testified about his interactions with Marks at the jail.  Sergeant Lewis testified that in August 1991 Marks submitted an inmate request form reading, "I am involved in a civil matter now pending in the California State Supreme Court.  As there are time constraints which must be met, and I am an indigent party in pro se in the instant case, please meter these documents for mailing forthwith.  I have in my possession the necessary waivers for court materials, mailing, et cetera."  Marks also requested legal materials pertaining to personal injuries.

Sheriff's Deputy Timothy Durbin testified that in June 1992 Marks asked to speak with him about the "possibility of finding some work" in the bakery or kitchen.  Marks wrote Durbin, "I feel it will be best to remain in West 2 housing until after my competence hearing 6-12-92 – 6-29-22, to play it safe before going before the courts for upcoming hearing." Marks added, "I am still interested in work."  According to Durbin, Marks later told him that he wanted a job because, "if he was able to get a job, get work, it would look better to his jury when he went to trial later in the year."  Durbin also testified that Marks explained that he had declined an invitation to appear on the television show "America's Most Wanted" on the advice of one of his attorneys, Sawyer. According to Durbin, Marks said "his attorney had told him that it wouldn't be in his best interests, he might slip up, to use his words, 'trip himself up,' and hurt his case."  Durbin

further testified that Marks told him that he had a competency hearing in June "to see whether or not I am sane." According to Durbin, Marks told him, "I should lose that in June and I'll start my main trial later in the year or early '93." A juror asked whether Durbin ever noticed anything odd about Marks's speech, such as repetitive speaking, rambling, or unfocused speech. Durbin responded that his conversations with Marks had been "to the point. He has something to ask me, he asks it in logical sequence, and once the answer is given, he doesn't continue to ramble." The court asked Durbin whether he had noticed "a pattern of repetitive speaking start and then getting stuck." Durbin responded, "He may have a slight speech impediment but nothing that stood out—stuttering."

Following closing arguments, the twelve-member jury unanimously found Marks competent to stand trial. The presiding judge, Michael Ballachey, denied Marks's motion for judgment notwithstanding the verdict, concluding that the jury was not obligated to accept the opinions of the experts and that "the testimony of Deputy Durbin alone was . . . substantial evidence which raises a conflict in the evidence that the jury apparently resolved against Mr. Marks."

The California Supreme Court upheld the verdict on direct appeal years later. *Marks*, 72 P.3d at 1236–38. In reaching that conclusion, the court noted, among other things, that "Dr. Gudiksen's information about defendant's history was limited to that which she received from defense counsel and her meetings with defendant"; that "Dr. Burstein acknowledged he was familiar with the determinations of the other experts (one of whom was an acquaintance) before examining defendant for himself"; that the defense experts "were unfamiliar with much of the evidence that tended to

render defendant's behavior comprehensible," including the fact that Najpaver was attempting to negotiate a plea agreement that would have generated a conviction without a trial; that Dr. Rosenthal's testimony that Marks did not know what he was charged with was contradicted by Marks's own words; and that Marks's own "statements and conduct . . . showed he could assist counsel in the conduct of the defense." *Id.* at 1236–37.

> Although he did not cooperate with the attorney who was trying to arrange defendant's conviction for noncapital murder, he cooperated with Attorney Sawyer because he trusted her. He took her advice not to appear on television and he sought work to make a good impression on the jury. Defendant thus showed he *was able* to cooperate with counsel but sometimes *refused* to do so, largely to achieve a substitution of counsel. In [the 1989 prosecution for grand theft in which Dr. Burstein had found Marks competent], defendant remarked, "I know I acted like a zip-down fool in the courtroom. I don't want Mr. Denton as my attorney and I will not cooperate with him." Defendant promised to cooperate and refrain from acting like a "zip-down fool" if he were granted a new attorney.

*Id.* at 1237.

In October 1992, four months after the competency trial, Marks was charged with assaulting a jail employee. A month later, the judge overseeing that prosecution, Ronald

Hyde, suspended proceedings under Penal Code section 1368 and ordered a competency determination in the assault case. Judge Hyde's brief order provides no specific facts concerning the reasons for ordering a competency determination. The prosecution dismissed the assault charges before a competency hearing could take place.

In December 1992, Louis Wies and Alfred Thews took over Marks's defense in the capital case, replacing Najpaver, McGrew, and Sawyer. Marks continued to file motions for substitution of counsel.

On January 21, 1994, three days before the beginning of trial, Wies moved to suspend proceedings under Penal Code section 1368. Wies and Thews told the court that they had been able to meet with Marks on a weekly basis over the previous year and had concluded over that time that he was competent to stand trial. As Wies explained:

> When we got this case we talked to Delaney quite frankly, and only among ourselves, is there a problem with Delaney's cooperating with counsel and his competency for trial. And after probably a couple of months Mr. Thews and I agreed among ourselves that there was not an issue, that Delaney was cooperating, that Delaney was able to understand what was going on. He was able to help us in preparation and help us in discussing all matters connected with the case. That has been the case up until today.

In preparation for trial, however, defense counsel had played a recording of Marks's post-arrest interview with the police in which Marks had admitted to acquiring the revolver days

before the shootings. Marks, who insisted at the time of trial that he had acquired the gun *after* the shootings, refused to acknowledge that the voice on the recording was his. Thews explained that Marks was "not accepting that kind of reality" and that counsel could "not under the present situation . . . address the issue of the contents of the tape in order to be able to respond at trial."

In addressing whether to order a second competency hearing, the trial court applied California law holding that,

> [w]hen a competency hearing has already been held and defendant has been found competent to stand trial . . . , a trial court need not suspend proceedings to conduct a second competency hearing unless it is presented with a substantial change of circumstances or with new evidence casting a serious doubt on the validity of that finding.

*People v. Kelly*, 822 P.2d 385, 412 (Cal. 1992) (quoting *People v. Jones*, 811 P.2d 757, 780 (Cal. 1991)). After taking a weekend to review the transcript of the 1992 competency trial, trial Judge Jeffrey Horner concluded that a second competency determination was unwarranted:

> I am satisfied that there is no substantial change in the defendant's circumstances or in his mental state or in his relationship with his attorneys. Nor—and I am equally satisfied that there is not any new evidence that has been presented to me on these issues which would require me to suspend, again, criminal

proceedings and conduct new proceedings under section 1368 of the Penal Code.

And I particularly note that not only has, in my view, has there been no evidence presented to me, but I note that I have had what may be a unique opportunity to actually discuss matters relating to the issue before me, that is the ability of the defendant to cooperate with counsel [during a motion for substitution of counsel heard on January 21, 1994]. I have had the chance to discuss the general issue of the relationship of himself and his counsel at great length.

So I'm satisfied, based on all of this evidence, and in particular my own observations of him in this courtroom, that there is no substantial change in his circumstances nor any new evidence to indicate that I should suspend proceedings.

I note there has been, as Mr. Wies and Mr. Thews indicated Friday, a difference in interpretation and opinion regarding a particular piece of potential evidence. Obviously each case differs, and I can't draw any generalizations from case to case. But I will make the general observation that this is not at all unusual in a case of this complexity, that there be disagreement between counsel and a particular defendant regarding a case of this complexity.

So, my finding is under *People v. Kelly*, there is no substantial evidence, or rather

substantial change of circumstances, there is no new evidence which would indicate that I should have a serious doubt of the validity of the finding of the jury in July of 1992, that Mr. Marks is competent to stand trial.

So, the motion to suspend criminal proceedings is denied.

I would also note in this respect I have made my ruling based on the lack of any substantial change of circumstance and the lack of new evidence based on my own observations here in this courtroom. It would appear to me that every indication is that the defendant, Mr. Marks, is fully capable of cooperating with his attorneys, and I see no evidence to indicate that this would not be the case in the forthcoming trial.

During the ensuing trial, Marks engaged in occasional outbursts over what he perceived to be weaknesses in the prosecution's case or deficiencies in his attorneys' presentation of a defense. Although Marks relies on these outbursts as evidence of his incompetence, the California Supreme Court reached a different conclusion on direct appeal. The California Supreme Court reasoned that Marks's

most conspicuous outburst during trial amply proves his ability to understand the proceedings and assist counsel. When the prosecutor concluded his redirect examination of John Myers, defendant interrupted, "Your Honor, I object. This

person stated it was not me, it was No. 6 who committed the shooting . . . . He did not even ask." Discussion among the attorneys and the court revealed that Myers had selected a suspect other than defendant at a photographic lineup. The prosecutor recognized, however, there was a sound tactical reason for defense counsel's not asking Myers about his failure to select defendant: Myers had indicated "it was a toss up" between defendant and the "number six" individual; Myers finally chose the latter. Although there was a legitimate reason for not asking Myers about his selection at the lineup, defendant's comment reflected he comprehended not just the nature of the proceedings but the state of the People's case and its potential deficiencies. Defendant also demonstrated his ability to offer assistance to counsel, even if such assistance was neither solicited nor welcomed.

*Marks*, 72 P.3d at 1237–38.[6] The record contains other examples of similar conduct. On cross-examination by defense counsel, for example, eyewitness Diane Griffin testified that she did not notice whether the shooter had facial hair. Marks presumably believed that defense counsel did not do enough to challenge the witness's credibility on the facial hair issue, interjecting, "May I object. If [lead prosecutor Kenneth] Burr walked within ten feet of her she could see his mustache." During the defense's cross-

---

[6] The trial court temporarily removed Marks from the courtroom following this outburst.

examination of witness Grace Haynes, Marks similarly complained that his attorney kept "blotching"—i.e., botching—the question about facial hair.

Marks testified on his own behalf during the guilt and penalty phases of the trial. Marks's testimony as a whole suggested that he possessed at least a modest understanding of the proceedings—including the charges against him, the purpose of the trial, and the respective roles of the judge, jury, witnesses, prosecutor, and defense counsel. With some exceptions, Marks understood and rationally answered the questions he was asked. Marks's direct examination during the guilt phase of the trial, for example, began as follows:

> Q:     Good afternoon, Mr. Marks.
>
> A:     Good afternoon, Mr. Thews.
>
> Q:     Did you grow up in Alameda and Oakland?
>
> A:     Yes.
>
> Q:     And your family lived primarily in Alameda?
>
> A:     Yes, they have.
>
> Q:     And where did you go to school?
>
> A:     Various locations. I'm not here for going to school. I'm in here for a suspect for homicide.
>
> Q:     Did you go to school in Alameda?
>
> A:     Yes, I did.
>
> Q:     Graduated from high school there?

A:     I did that also, too.

Q:     After you graduated, did you enter the service?

A:     Service has nothing to do with what—the service doesn't pertain to these proceedings.

Q:     Did you enter the service?

A:     Did I?  Yes, I did.

Q:     And what branch did you go into?

A:     Umm, I went into the Navy.

Q:     And—

THE COURT:     I'm sorry, I didn't hear you, sir.

A:     I went into the Navy, the naval services.

THE COURT:     Thank you.

Q:     After you got out of the Navy did you return then to the Alameda area?

A:     Umm, not really.  In some respects.

Q:     How about Oakland, did you return to the Oakland area?

A:     That's the same location, Oakland, Alameda County.

Q:     Now, I want to direct your attention to October of 1990, and more specifically to the 15th of October of 1990.  Have you got that in mind?

A:      Not really, but if you ask me a question I'm more than sure I can answer it.

Q:      You got it.  Did you receive a check for assistance on the 15th of October?

A:      First, I'd like to clear up, I've never been on welfare.  I was in the employment program.   That's attached to the welfare building, and we have certain requirements we must meet to receive a check every two weeks, and I did receive a check on that day. Excuse me for the delay.

Q:      You got a check?

A:      For $170 for—I did work for that money.  It wasn't just given to me.  I don't bear kids, I don't have any children.

Q:      Now, what did you do with that check on the 15th?

A:      I cashed it.

Q:      And tell me where you cashed it?

A:      I cashed it across the street from the old folks' park, old man's park in West Oakland.

Q:      Is that near the housewives market there?

A:      That would be to the right of housewives market, going in the direction of West Oakland.

Q:      At the time that you cashed the check, was anybody with you?

> A:      No, I don't keep anybody with me
> when I'm having any money 'cause it's my
> personal business.  If I have any money, then
> I'll put them elsewhere until I finish taking
> care of my business.  Then I make myself
> visible with them.  That's something I prefer
> to keep personal.
>
> Q:      So you were alone when you cashed
> the check, right?
>
> A:      In some respects.  Someone was with
> me, but I had them—I detained them until
> I'm finished taking care of my business, as
> far as my check was concerned—concerned.
>
> Q:      Who was the person that was with
> you before you cashed the check?
>
> A:      The person that was with me before I
> cashed my check was Robin Menefee.

Marks also provided detailed testimony about where he was at the time of the shootings and how he came to be in possession of a firearm.

Notwithstanding the tenor of Marks's testimony generally, at times Marks appears to have struggled to understand the questions he was being asked or the purpose of those questions.  During guilt-phase cross-examination, for example, the prosecutor, Burr, attempted with little success to establish the anodyne fact that Marks had prepared for his testimony:

> Q:      You, over the weekend, you prepared
> for your testimony here, right?

A:      No, I never prepare for my testimony. I prepare for one speech. But I'm more than sure that you would not let me say it, Mr. Burr, because it is somewhat criticism on your part, which you did criticize me a great deal at the opening of these proceedings, but I overlook that because I understand your position.

Q:      Your Honor, nonresponsive after the word no.

THE COURT: It is, Mr. Marks, so I'm going to strike all of that, too. So please answer the questions that are asked.

Q:      Sir, didn't you say here in court that you have been studying over the weekend, studying for your testimony here?

A:      Complete that question which you stated. I mean you deleting, you're trying to make me say something that I didn't say. Make that a full sentence. I understand English is a broken language, but make a full statement. State what you stated from the beginning and I will give you an answer, because in the abstract and in the scope of things I'm not going to do things—do that again.

THE COURT:      Mr. Marks—

A:      I'm not a Laurel and Hardy you understand. I want you to know that you're in competition, baby.

THE COURT: Mr. Marks, you asked him to restate the question, and he will do that.

Q: Mr. Marks, over this past week didn't you study in order so that you could testify here?

A: I never studied in my testify, I studied something I wanted to say to the court in, in opposed to, not opposed to in regards to the statement, that accusation, I'm talking about that statement that you made of me. That's what I wrote down. That's what I studied. Here they are right here. But I wasn't sure you would not let me read this. That's what I was referring to, not going in out of my position, because I put—

THE COURT: Mr. Marks, you have answered.

A: Not going out of the jurisdiction of the prosecution, in other words. That's what I'm saying.

THE COURT: Mr. Marks.

Q: In the process of getting ready to tell the jurors what you wanted to tell them when you took the stand, you have had a lot of time to think about it, haven't you?

A: I had my mind on other things because my counsel was supposed to be tending to those matters.

Q: Weren't you thinking about how you would explain to the jury all the various things that happened to you that evening?

A: I wasn't walking on the street taking notes. I had to rehear something that I know I didn't commit. I will—if I had did something I'd be worried and having to try to think of some type of story, but if I'm innocent why should I?

THE COURT: Mr. Marks, again all of that is nonresponsive.

A: He asked me something. I'm explaining it.

THE COURT: No, you have to answer the questions that are asked. Those are the rules in terms of direct examination of Mr. Thews, and they are the same now on cross.

A: He was saying tricky—I'm saying I'm not studying on this, they're supposed to be doing this, not me.

THE COURT: Your testimony is not an opportunity to make a speech that isn't related to the question. So that's stricken.

A: I'm just saying—

THE COURT: You are not answering questions.

A: It's vague.

THE COURT: We will deal with that. But answer the questions the best you can.

A:      I pointed it out to be noted exactly how I'm answering the questions in the phrases.

THE COURT: The reporter is doing the best she can to report exactly.

A:      I understand the use of the words, and he want to make that liar out of me not in the cannibalist of sabotage, it's barbaric words, murder, by the use of words that I should have come in contact with Kenneth Burr, there telling me I murder—

THE COURT:          Mr. Marks, by the cross-examination, the prosecution—

A:      Well he say—

THE COURT:          Let me say it again.  If you don't follow the rules here I'm going to take a recess and I'm going to have to take some action.  I don't want to do that, but I'm being left with fewer and fewer alternatives here.  So please, one more time answer the questions that are being asked.

A:      Yes, sir.  Yes, sir.

Q:      Now, since the time of your arrest you have gone over the things that happened that you did that evening of October the 17th, 1990, haven't you?

A:      No, Mr. Burr, I haven't.

Q:      You haven't thought about what you were doing or who you were with?

A:      No, I haven't given any thought in the last three and half years.   No, I—no, I haven't.

Q:      You haven't relived that time over and over in your mind to recall who you were with and what you were doing when the shootings went down?

A:      I haven't relived that down—or no. All I wrote down was where I was and it was after a period of over 1,095 days and some odd months to refresh my memory all the events that took place that night.  I just wrote down because you're a very good prosecutor if you allow me to speak, to have everything in the scope of things, because we, we're not, not abstracts and we should speak, and we should have some tact as far as business is concerned.  We should be able to speak as gentlemen.   And so I wrote it down everything according to your question.

THE COURT:          Thank you.

A:      Man I never had studied it, because I should remember that, that's why, because I know in your motion I'm not biased to you, I'm not—no disrespect Kenneth—

THE COURT: Mr. Marks, answer Mr. Burr's next question.

A:   Mr. Burr is nice. He's very super, you know—

At times, moreover, Marks gave rambling and even incoherent answers to the attorneys' questions. When describing his brief service in the Navy in the mid-1970s, for example, Marks testified that he had been "a nukie in charge" and "a lieutenant commander," had been placed in charge of handling recruits, had received a Presidential award, and had been in charge of handling nuclear weapons "till we brought Vietnam War to a standstill in the Bermuda Triangle, against the Soviet Union."

Other evidence suggested the possibility that Marks held delusional beliefs. Marks apparently was convinced, for example, that the judge overseeing the preliminary hearing had found a conspiracy between the prosecution, the probation office, and defense counsel, and that his trial attorneys had accepted bribes to assist in his conviction. He also apparently believed that transcripts of the preliminary hearing had been altered and that the voice on the recording of his interview with the police was not his. Dr. Rosenthal later testified that Marks had "fixed false beliefs that . . . witnesses who testified at the preliminary examination excluded him as being the suspect,[7] that different photographs of Mr. Marks had been substituted for exhibits

---

[7] Marks apparently was convinced that Susan Yi, a prosecution witness, had testified at the preliminary hearing that he was innocent and that his girlfriend, Robin Menefee, was guilty. In fact, Yi had testified that she could not identify the man in question because she did not see his face.

that were put in evidence at the preliminary examination,[8] . . . that the prosecution was 'found guilty of bribery, of bribing witnesses' at the preliminary examination,"[9] and that the voice on the tape recording of the police interview was not his. Marks was also unable or unwilling to accept the proposition that his attorneys were working on his behalf. During the penalty phase of the trial, for example, defense counsel asked Marks whether he had assaulted Brenda Bailey. Marks complained that his attorney was "indirect[ly] prosecuting" and "asking these questions" to make him "appear guilty."

Defense counsel filed two additional motions during trial to suspend proceedings for a competency determination. In March 1994, Wies and Thews advised the court that Marks was unable to have a conversation with them, that Marks was "absolutely incapable of listening to us," that Marks was "absolutely unable to assist us in any way, shape, or form in defending him," and that Marks was convinced that his lawyers had accepted bribes to assist in his conviction. They also observed that Marks's disruptive conduct in the courtroom was prejudicing his defense. In an April 1994 motion prompted by Marks's trial testimony, counsel argued that Marks was unable to answer direct questions, unable to

---

[8] At a March 17, 1994 substitution of counsel hearing, Marks claimed that the photos of him after his arrest were not the photos presented at trial. Defense counsel Thews later testified that Marks's theory that someone had switched the photographs "had no basis in reality."

[9] At a substitution of counsel hearing, Marks asserted that, "in the preliminary hearing examination, [the prosecutors] were found guilty of bribery, of bribing witnesses. They bribed the probation department, they bribed the Alameda Sheriff's for Robin Menefee to be released from custody so she would appear admissible." Thews later testified that this theory too had no basis in reality.

understand the proceedings, and unable to cooperate with counsel. Judge Horner denied both motions. In March, the court saw no substantial change in Marks's condition, concluding that counsel's complaints were similar to those made by counsel in connection with the 1992 competency determination—"lack of cooperation, differing views in terms of the quality of evidence and how the case should be presented, things of this nature." In addition, drawing again on its own observations, the court said that

> Mr. Marks has at great length and with an admirable and articulate ability, has expressed his understanding of these proceedings, his in depth understanding of the criminal procedure, his in depth understanding of oftentimes merely awesome proportions of the facts of this case, of the testimony of witnesses, of the contents of police reports, of the contents of preliminary examination transcripts, of the details of the testimony that's been received here in open court. Has expressed and analyzed that testimony and pointed out ways in which that testimony is subject to either criticism, that it can be—it can reflect weakness or purported weakness in the prosecution's case, discrepancies in witnesses' testimony, things of this nature. I have been impressed. In fact Mr. Marks has a remarkable grasp of the facts of the case that has been presented in the course of this trial and at earlier proceedings in the course of this trial.

As counsel are aware I have been involved in the criminal justice system in one capacity or another since 1966. I cannot remember another criminal defendant, that is someone charged with a criminal offense, that has expressed in open court as comprehensive a grasp of the case against him as has Mr. Marks.

Now, there is a clearly a considerable area of dispute between Mr. Marks and his attorneys as to how the case should be handled. But I do not find that is any different than that was expressed in 1992 at the trial of the competency hearing then or that was expressed and reflected by counsel's remarks and motions at the beginning of this trial. There has been no substantial change in circumstances here. Certainly no new evidence or substantial change of circumstances that cause a serious doubt on my part as to the validity of the finding by the jury in 1992 that he's competent to stand trial.

On the contrary. As I have stated at length and will state my conclusion again, I find that Mr. Marks has a remarkable grasp of both technical detail, tactics and facts involving his case. If he chooses not to cooperate with counsel, that's something obviously I can't prevent. But I think he has an absolute and comprehensive ability to cooperate with counsel, and he has expressed

and acted on that ability on various occasions.

In April, the court once again found that Marks was "fully in command of his faculties" and was making a conscious decision to present the jury with a story that he believed was in his best interests.

Marks was convicted and sentenced to death.

Years later, on direct appeal, the California Supreme Court sustained the trial court's decision to forgo a second competency hearing. *Marks*, 72 P.3d at 1237–38. The court noted that, "once a defendant has been found to be competent, even bizarre statements and actions are not enough to require a further inquiry," that "[r]eviewing courts give great deference to a trial court's decision whether to hold a competency hearing" because "'[a]n appellate court is in no position to appraise a defendant's conduct in the trial court as indicating insanity, a calculated attempt to feign insanity and delay the proceedings, or sheer temper,'" and that Marks's conduct at trial "amply prove[d] his ability to understand the proceedings and assist counsel." *Id.* at 1237 (quoting *People v. Marshall*, 931 P.2d 262, 279 (Cal. 1997)).

In 2002, eight years after the trial, Marks filed a state habeas petition asserting that he had been incompetent to stand trial in 1994. Wies had passed away by this time, but Thews submitted a declaration in support of the petition. Thews stated that "Marks could not accept the fact that the voice on the tape recording of his statement to the police was actually his voice"; that Marks "believed that the prosecution, or someone, had switched photographs from the exhibits admitted into evidence at the preliminary hearing, and that the prosecution had been adjudged guilty of bribing

witnesses"; that Marks was "convinced that a witness, Susan Yi, excluded him as the assailant in one of the fatal shootings, when, in fact, Ms. Yi had not seen the shooter at all"; that Marks was "obsessed with discrepancies between" certain eyewitnesses' "description of the suspect and his own appearance" and could not understand why defense counsel were not challenging the witnesses' credibility while they were testifying; that, as a witness, Marks "could not control his urge to argue what he thought were significant points in the evidence, such as discrepancies in the eyewitness identifications and his own appearance"; that Marks "went off on incomprehensible tangents, jumping from subject to subject that did not have any rational connection to the case"; and that Marks "was not able to comprehend what was going on," was "seriously out of touch with reality," and was "in no condition to cooperate rationally in his defense." Thews also said that Marks's "paranoid delusions were making it impossible for us to communicate with him. We concluded that he was simply without understanding or awareness."

A defense team investigator, Lauren Church Hatvany, also submitted a declaration in support of the petition. She said that Marks "was seriously mentally ill," and preoccupied and obsessed with his hair and with the musician Prince. She testified that it "was not possible to have a normal conversation with him," because he "would . . . jump around from one irrelevant topic to another," and that, when he testified, he "could appear relatively lucid at times" but at other times would answer questions "with illogical responses, and [he] would frequently drift into tangents." She concluded that Marks "did not seem able to be genuinely involved in his defense."

Marks also presented declarations from jurors and witnesses who had observed him at trial. Prosecution

witness Sherman Boyd, for example, noted that Marks "did not seem to comprehend anything while I was in the courtroom." Prosecution witness Brenda Joyce Bailey testified that Marks "did not seem to understand what was going on or why I was there." And Juror Anita Clifton testified that Marks had offered "incoherent, disjointed, and irrelevant" testimony, showing that "he was mentally unsound."

Most significantly, Marks submitted declarations from a half dozen mental health experts supporting his incompetency claim. Clinical psychologist Karen Froming conducted a clinical evaluation of Marks in 2002, encompassing twenty hours of examination and testing. Dr. Froming began by summarizing the work of others. She noted that Dr. Stein, in 1992 testing, had found "very significant brain impairment"; significant memory deficits, placing Marks in the bottom 2 to 4% or bottom 10%; and academic functioning in math, spelling, and reading at a second- or third-grade level. She noted that Dr. Jo Gilbert, in 1990, had assigned Marks an IQ of 65, with 69 or below considered intellectually disabled. Dr. Froming concluded that her own tests confirmed these results. Froming noted "significant neurological impairments with psychiatric manifestations." She found that Marks's test results were consistent with damage to the frontal and temporal lobes; that the severity of the memory impairment "substantially compromises his ability to accumulate knowledge or appreciate new information in light of what he previously learned"; that Marks's reading comprehension was at a fourth- or fifth-grade level; that Marks's frontal lobe deficits prevented him from structuring his speech, causing his speech to come out in a torrent of words; that Marks scored in the thirteenth percentile on a smell function test,

suggestive of frontal lobe damage; that Marks's frontal lobe
deficits "significantly impaired his cognition and executive
functioning"; and that Marks's "neurological deficits would
be expected to have substantially impaired the functioning
that is necessary to attend and rationally participate in
judicial proceedings." Dr. Froming concluded that:

> Mr. Marks's neurologically-based auditory,
> visual, attention and language deficits
> prevent Mr. Marks from discriminating in the
> first instance between information that is
> most import[ant] and information that is least
> important. Damage to Mr. Marks's frontal
> lobes compromises his ability to prioritize
> and organize information, and the damage to
> both his frontal and temporal lobes impairs
> his ability to retrieve information. As
> discussed previously, these functional
> deficits prevent Mr. Marks from
> accumulating and organizing information in
> the manner necessary to appreciate the
> significance of new information in light of
> the information to which he already has been
> exposed. In the context of his trial, this meant
> Mr. Marks would have extreme difficulty
> retaining and building a fund of information
> from one day to the next and in tracking the
> proceedings to understand how each day's
> events related to the trial as a whole.

She noted that at trial Marks "frequently missed the point of
the discussions in which he was involved" and exhibited
"delusional ideation and identity defusion." On the
MacArthur Competency Test, Marks exhibited mild

impairment in understanding and clinically significant impairment in reasoning and appreciation, resulting in an overall score in the incompetent range. Dr. Froming reported that "Marks was severely impaired by both his brain damage and his psychiatric dysfunction at the time of trial." She concluded that:

> Marks shows marked impairments in delayed memory, moderately syntactically complex language comprehension, frontal lobe functions of behavioral self-regulation, problem-solving, shifting cognitive sets, and taking in new information. Mr. Marks competency is currently severely impaired. Because all clinical indications are that his neuropsychiatric disorder is of the same severity now as it was then, it is my opinion, which I hold to a reasonable degree of clinical certainty, that Mr. Marks was incompetent and unable rationally to assist his trial counsel or otherwise participate in his defense. No standardized, structured competency evaluation was administered prior to or at trial. When such a test is administered, however, Mr. Marks is able only to identify, albeit marginally, the players in the courtroom. He is unable to take in new information, unable to verify if old information is correct or incorrect, cannot choose salient information to relay to counsel, and is unable realistically to appraise

options presented to him based on the information given.

Psychiatrist Fred Rosenthal, who had testified at the 1992 competency trial, opined on Marks's competency again in connection with the state habeas proceedings. Dr. Rosenthal stated in 1992 that Marks had a "disturbed mental state," "did not seem to be firmly connected to reality," and suffered from "periods of clearly irrational and paranoid thinking." In Dr. Rosenthal's view, although Marks seemed "mentally intact at times" and "was able to converse rationally at some points," it was "evident that an actual psychotic mental state existed and this was either a chronic functional disorder or the result[] of organic brain damage." In 2002, Dr. Rosenthal concluded that Marks suffered from significant pervasive brain damage, impaired executive functioning and memory, and delusional thinking. He diagnosed schizoaffective disorder and chemical dependency and found that Marks was unable to control his conduct and engaged in impulsive behavior. Dr. Rosenthal acknowledged that the jury had rejected his opinion in 1992 but emphasized that his examination of Marks at that time had been limited and that he had testified without the benefit of Dr. Stein's neuropsychological testing.

Clinical psychologist David Stein had conducted neuropsychological testing on Marks in 1992 and, like Rosenthal, had testified at the competency trial. He had not, however, been asked at that time to opine on Marks's competence to stand trial. Dr. Stein determined that Marks's "test results were in the impaired range for all seven of the critical indicators of brain impairments" and that Marks

"suffer[ed] considerable, pervasive organic brain damage."
He stated:

> In 1992, I was not asked to opine whether Mr.
> Marks was mentally competent to stand trial.
> If I had been asked to do so, I could and
> would have testified truthfully that in my
> clinical judgment the functional impact of
> Mr. Marks's neurological deficits and
> thought disorder made him unable to
> understand the nature of the trial proceedings
> or to assist his attorneys in a rational manner.
> Mr. Marks's performance on tests that
> correlate with the nature and severity of
> frontal lobe and temporal lobe damage, the
> resulting impact on executive functioning
> and memory and his evidence susceptibility
> to distraction by internal stimuli were
> predictive of Mr. Marks's inability to
> comprehend or conform his behavior to the
> requirements of trial proceedings.

Dr. Stein concluded that Marks's "impulsivity, pressured
and tangential speech, and loose associations were reliable
clinical indications that he would be unable to appreciate the
linear nature of the trial process or his appropriate role in it."
He also cited "the delusional and paranoid qualities of
[Marks's] disordered thinking." After reviewing the
transcripts of pretrial proceedings and the 1994 trial, Dr.
Stein concluded that

> Marks's statements and testimony reveal a
> human being suffering from significant
> neurological and mental impairments that

make him unable to control his impulsive, perseverative thoughts or to understand how he and his attorneys must proceed to protect his own interests. Mr. Marks's pre-trial statements in court were generally rambling, frequently unintelligible and mostly incoherent. He was unable to track the substance of conversations or the meaning of questions posed to him, frequently was unable to give responsive answers and missed the significance of information provided by his attorneys to the court.

Psychiatrist George Woods performed a neuropsychiatric evaluation of Marks in 2002. Dr. Woods noted Marks's troubled childhood and testing by Drs. Gilbert, Stein, and Froming "document[ing] profound cognitive impairment in Delaney's frontal and temporal lobes." Dr. Woods concluded that Marks suffered from "neurologically based learning disabilities"; delusions; significant neuropsychological impairments; impaired executive function, compromising his ability to conceptualize, sequence, weigh, and deliberate, as well as his ability to adapt his behavior; dementia; depression, disassociation; PTSD; psychosis; and schizoaffective disorder, causing him to view the world through a psychotic lens. He concluded that Marks's "brain impairment coupled with his disruptive psychotic illness, left [him] unable to appreciate the nature of his actions or to conform his behavior to the law at the time of the offenses for which he was tried and convicted, and incompetent rationally to understand the proceedings or to assist in his defense during the period in which he was tried."

Psychiatrist Karen Gudiksen, who had testified at the 1992 competency trial, opined on Marks's competency again during the state habeas proceedings. She once again concluded that Marks suffered from "delusional, paranoid" and "disordered thinking" and "cognitive impairments . . . consistent with . . . reported head traumas and/or substance abuse" and was "incapable of understanding the nature of the criminal proceedings or rationally assisting counsel in his defense." Dr. Gudiksen cited Marks's significant, neurologically impaired executive and cognitive functioning impairments and his delusional and paranoid ideation. In her view, Marks was not able to contextualize and integrate information to the degree necessary to follow the proceedings and understand what information is important and what is not. She said that Marks's trial testimony exhibited his disinhibited and impulsive behaviors, pressured, tangential speech and disordered, psychotic thought processes, reflecting both "psychosis and significant brain damage." Like Dr. Rosenthal, Dr. Gudiksen acknowledged that the jury had rejected her opinion in 1992. But she emphasized that her opinion in 2002 was based on additional information, including both Dr. Stein's test results and the evidence of Marks's 1994 trial testimony.

Psychologist Ruben Gur conducted a neuropsychological assessment of Marks in 2003. He diagnosed schizophrenia, disorganized type; post-traumatic stress disorder; and intellectual disability and opined that Marks's "impairments prevented him from understanding the nature of the proceedings or rationally assisting in his defense."

Marks also submitted a declaration from clinical psychologist Julie Kriegler. Kriegler completed a psychosocial history and psychodiagnostic assessment of

Marks in 2002 and documented evidence of Marks's "emerging psychotic disorder" following his service in the Navy. She placed a heavy emphasis on evidence of Marks's troubled childhood, which allegedly included fierce beatings, domestic violence, substance abuse, fights, racism, a traumatic home life, food deprivation, lack of a nurturing environment, and being thrown out of the home.

In 2005, the California Supreme Court summarily denied Marks's competency claim.

In 2011, Marks presented the competency claim in his federal habeas petition. In 2016, the district court denied the claim under § 2254(d). The court concluded that Marks "behaved at trial as if he understood the nature and purpose of the proceedings against him and was capable of assisting in his defense" and that Marks's trial interruptions "could reasonably be interpreted as rational efforts to make points that he felt needed to be made." Although Marks's experts offered a reasonable interpretation of the evidence, the court concluded that the state court's interpretation of the same evidence was objectively reasonable under AEDPA.

On appeal, Marks contends that the district court erred. To satisfy § 2254(d), he presents two arguments: (1) that the California Supreme Court's summary denial of his competency claim rested on an antecedent objectively unreasonable application of Supreme Court precedent because the state courts declined to hold a second competency hearing after Judge Hyde raised a bona fide doubt as to his competence in his assault case; and (2) that the California Supreme Court's summary denial of this claim—reflecting the state court's conclusion that his state petition failed to establish a prima facie case of

incompetence—is objectively unreasonable.   We address these arguments in turn.

## B.  Antecedent Unreasonable Application of Clearly Established Law

"When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). "A federal court must then resolve the claim without the deference AEDPA otherwise requires." *Id.*

Marks contends that this principle applies here.   In November 1992, Judge Hyde ordered a competency determination in Marks's assault case.   The State dismissed the assault charges before that competency determination could be made, and Marks subsequently was tried and convicted in the capital case without a further competency determination taking place.   Marks contends that the failure to hold a second competency hearing in the capital case in light of Judge Hyde's order raising a bona fide doubt as to his competence in the assault case amounted to an unreasonable application of the Supreme Court's decisions in *Pate v. Robinson*, 383 U.S. 375 (1966), and *Drope v. Missouri*, 420 U.S. 162 (1975).   *Pate* held that, "[w]here the evidence raises a 'bona fide doubt' as to a defendant's competence to stand trial, the judge on his own motion must impanel a jury and conduct a sanity hearing."   383 U.S. at 385.   *Drope*, in turn, holds that, "[e]ven when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial."   420 U.S. at 181.   Marks contends that Judge Hyde's order in the assault case created

an "unresolved" bona fide doubt as to his competence to stand trial in the capital case and thus that he could not be tried or convicted in the capital case without a second competency hearing taking place:

> At the time the state court summarily denied Mr. Marks's postconviction claim, the record before it thus demonstrated that he had been forced to stand trial and sentenced to death despite the existence of an unresolved "bona fide doubt" about whether he was, in fact, competent to stand trial. But when the evidence before a court is sufficient to raise a doubt "as to [the defendant's] present competence" a competency "hearing *must* be held." *Pate v. Robinson*, 383 U.S. 375, 387 (1966) (emphasis added) . . . . The state court's failure to conduct the hearing required by *Robinson*, either at the time of trial or during post-conviction proceedings, was an antecedent legal error, and rendered its decision on Mr. Marks's habeas claim of incompetence contrary to and an unreasonable application of clearly established federal law.

Opening Br. at 27 (first alteration in original).

We reject this argument. First, the California Supreme Court's failure to order a second competency hearing in response to Judge Hyde's order was not "contrary to" *Pate* or *Drope*. As noted, a state court decision is "contrary to" federal law if it applies a rule that contradicts the governing law set forth in Supreme Court cases or if it confronts a set

of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. *Williams*, 529 U.S. at 405–06. Neither of those conditions is present here. The Supreme Court has never held that a bona fide doubt finding in one prosecution requires a competency determination in a different prosecution—especially where, as here, a competency determination has already been made in the second case. The facts of this case, moreover, are readily distinguishable from those in *Pate* and *Drope*.

Nor did the California Supreme Court's decision involve an "unreasonable application" of *Pate* and *Drope*. Although a state court decision involves an unreasonable application of federal law when the state court unreasonably refuses to extend a Supreme Court precedent to a new context where it should apply, that principle does not apply unless it is "beyond doubt" that the Supreme Court's rulings apply to the new situation or set of facts. *Moore v. Helling*, 763 F.3d 1011, 1017 (9th Cir. 2014). Here, the California court reasonably could have concluded that *Pate* and *Drope* do not extend to this novel context.

Finally, the California Supreme Court reasonably could have concluded that Judge Hyde's order in the assault case did not raise a bona fide doubt as to Marks's competence to stand trial in the capital case. A jury had found Marks competent in the capital case only four months earlier, following an extensive trial on Marks's competence. Nothing in Judge Hyde's brief order in the assault case, moreover, suggested a change in Marks's circumstances. Furthermore, Marks's attorneys did not move for a second competency hearing in the capital case at that time. On the contrary, Wies and Thews, who took over Marks's defense a month later, in December 1992, were persuaded at that

time that Marks was competent to stand trial: "after probably a couple of months," they agreed among themselves "that there was not an issue, that Delaney was cooperating, that Delaney was able to understand what was going on. He was able to help us in preparation and help us in discussing all matters connected with the case." On this record, the California Supreme Court reasonably could have concluded that Judge Hyde's order did not raise a bona fide doubt as to Marks's competence to stand trial in the capital case.[10]

In sum, we hold that the California Supreme Court's adjudication of Marks's substantive competency claim was not dependent on an antecedent unreasonable application of the procedural rights established in *Pate* and *Drope*. The state court reasonably could have concluded that Judge Hyde's order in the assault case did not raise a bona fide doubt as to Marks's competence in the capital case.

## C.  Unreasonable Determination of a Prima Facie Case

Marks alternatively contends that he satisfies § 2254(d) on his competency claim because the California Supreme Court's determination that he failed to establish a prima facie case of incompetence was objectively unreasonable.

### 1. Framing the AEDPA Inquiry

Marks points out that the California Supreme Court summarily denied this claim on state postconviction

---

[10] In the district court, Marks alleged that the state courts' failure to hold a second competency hearing in the capital case violated his procedural due process rights under *Pate* and *Drope*. Marks does not appeal the district court's denial of that claim.

review—without granting an evidentiary hearing or ordering a response to the petition.  He notes that

> [u]nder California law, the California Supreme Court's summary denial of a habeas petition on the merits reflects that court's determination that "the claims made in th[e] petition do not state a prima facie case entitling the petitioner to relief." *In re Clark*, 5 Cal. 4th 750, 770, 21 Cal. Rptr. 2d 509, 855 P.2d 729, 741–742 (1993).  It appears that the court generally assumes the allegations in the petition to be true, but does not accept wholly conclusory allegations, *People v. Duvall*, 9 Cal. 4th 464, 474, 37 Cal. Rptr. 2d 259, 886 P.2d 1252, 1258 (1995), and will also "review the record of the trial . . . to assess the merits of the petitioner's claims," *Clark*, *supra*, at 770, 21 Cal. Rptr. 2d 509, 855 P.2d, at 742.

*Cullen v. Pinholster*, 563 U.S. 170, 188 n.12 (2011) (alterations in original).

Our case law may be in some tension regarding the proper framing of the AEDPA inquiry when the California Supreme Court summarily denies a federal constitutional claim on state postconviction review.  On the one hand, we held in *Nunes v. Mueller*, 350 F.3d 1045 (9th Cir. 2003), that the inquiry under § 2254(d) "requires analysis of the state court's *method* as well as its result."  *Id.* at 1054.  We concluded in *Nunes* that § 2254(d)(1) was satisfied because the petitioner "clearly made out a prima facie case of ineffective assistance of counsel" and "it was objectively

unreasonable for the state court to conclude on the record before it that no reasonable factfinder could believe that Nunes had been prejudiced." *Id.* at 1054–55; *see also Lopez v. Allen*, 47 F.4th 1040, 1048 (9th Cir. 2022); *Cannedy v. Adams*, 706 F.3d 1148, 1160–61 (9th Cir. 2013).

On the other hand, our decision in *Montiel v. Chappell*, 43 F.4th 942, 957 n.13 (9th Cir. 2022), states that, even when the California Supreme Court summarily denies a claim for failure to establish a prima facie case, "we must evaluate [the petitioner's] claims in their entirety to determine whether the California Supreme Court could reasonably reject those claims on the merits":

> Pinholster argued to the Supreme Court that the state court's implicit determination—in summarily denying his petition without issuing an order to show cause—that Pinholster had not even made out a "prima facie" case for relief was contrary to, or an unreasonable application of, clearly established federal law. *See* Brief for Respondent at 52–53, *Pinholster*, 563 U.S. 170 (No. 09-1088), 2010 WL 3738678 ("[T]he California Supreme Court's determination that Pinholster's allegations, taken as true, failed even to make out a *prima facie* claim was not only wrong, it was objectively unreasonable. It follows that § 2254(d) does not prohibit a grant of relief on the ground that trial counsel rendered constitutionally ineffective assistance at the penalty phase of Pinholster's capital trial."). Yet, rather than evaluate only whether

Pinholster had made out a prima facie case in his state habeas petition, the Supreme Court evaluated the full merits of Pinholster's claims to assess whether the California Supreme Court could reasonably have denied habeas relief. *See Pinholster*, 563 U.S. at 189–203, 131 S. Ct. 1388. To the extent that Montiel makes a similar argument to the one Pinholster made, we must reject it. *Pinholster* teaches that we must evaluate Montiel's *Strickland* claims in their entirety to determine whether the California Supreme Court could reasonably reject those claims on the merits.

We need not resolve any tension between *Nunes* and *Montiel* here. The inquiry under *Nunes* turns on "whether the allegations contained in the petition, *viewed in the context of the trial record*, established a prima facie case" of incompetence. *Cannedy*, 706 F.3d at 1060 (emphasis altered). Here, it was objectively reasonable for the California Supreme Court—viewing the trial record in its entirety—to conclude that Marks failed to establish a prima facie case of incompetence. We therefore need not resolve any tension in our case law.

## 2. Analysis

"It is well established that the Due Process Clause of the Fourteenth Amendment prohibits the criminal prosecution of a defendant who is not competent to stand trial." *Medina v. California*, 505 U.S. 437, 439 (1992). Under this principle, "a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to

assist in preparing his defense may not be subjected to a trial." *Drope*, 420 U.S. at 171. "[I]t is not enough for the [trial] judge to find that the defendant is oriented to time and place and has some recollection of events." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam) (alterations and internal quotation marks omitted). The "test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding— and whether he has a rational as well as factual understanding of the proceedings against him." *Id.* Here, we conclude that the California Supreme Court's conclusion during state postconviction proceedings that Marks failed to establish his incompetence during trial was not objectively unreasonable.

To be sure, Marks presented substantial evidence of incompetency. His trial attorneys, Wies and Thews, both concluded that he was incompetent at trial, and Thews submitted a declaration to that effect in 2002. Defense counsel's opinions are entitled to considerable weight because "defense counsel will often have the best-informed view of the defendant's ability to participate in his defense." *Medina*, 505 U.S. at 450; *see Williams*, 384 F.3d at 608 (deeming "especially relevant" counsel's opinion the petitioner was competent). Several mental health experts also opined that Marks was incompetent, and there were no expert opinions on the other side. Marks's trial testimony was, at least at times, confused, rambling, fantastic, and incoherent. And there was evidence that Marks held delusional beliefs. Marks's evidence—especially the consensus opinion of the mental health experts—presented a powerful case of incompetence.

There was also evidence of Marks's competence, however. The question of Marks's competence was tried to

a jury in July 1992. Twelve jurors heard from more than a dozen witnesses, including mental health experts, over seven days of testimony before unanimously finding that Marks was competent. The trial court and the California Supreme Court both sustained that verdict, concluding that it was supported by substantial evidence. The jury's verdict is presumptively correct. *See* 28 U.S.C. § 2254(d)(2), (e)(1).[11] Of course, competence can change over time, including in the context of different environmental factors and stressors, such that the 1992 verdict is not dispositive of Marks's competence during his 1994 trial two years later. But the jury's 1992 verdict is of some relevance to Marks's competence in 1994, as some of the same experts testified and the types of behaviors identified as indicating incompetence were similar.

The experienced trial court judge, moreover, was firmly convinced, based on personal observation and extensive interactions with Marks, that Marks was competent to stand trial. *Cf. Deere v. Cullen*, 718 F.3d 1124, 1145–46 (9th Cir. 2013) (pre-AEDPA case) ("Judge Metheny personally interacted with Deere on numerous occasions at every hearing and repeatedly found that Deere understood the proceedings and could cooperate with counsel in a defense. . . . His observation that Deere was competent is

---

[11] The precise role of § 2254(e)(1) in conducting an analysis under § 2254(d) has not been fully resolved. *See, e.g.*, *Brumfield*, 576 U.S. at 322; *Wood*, 558 U.S. at 304; *Stevens v. Davis*, 25 F.4th 1141, 1153 n.6 (9th Cir. 2022); *Kipp*, 971 F.3d at 953 n.12; *Murray*, 745 F.3d at 998–1001. In reviewing the merits of a habeas petitioner's claim *after* § 2254(d) is satisfied, we defer to a state court's factual findings under § 2254(e); "those findings are presumed to be correct, a presumption that can be overcome only by clear and convincing evidence." *Crittenden v. Chappell*, 804 F.3d 998, 1011 (9th Cir. 2015).

presumed correct . . . .").  The opinions of Wies and Thews are "not determinative," *Miles*, 108 F.3d at 1113, and the fact that Wies and Thews were persuaded of Marks's competence for more than a year before trial suggests that his later lack of cooperation could have reflected his unwillingness, rather than his inability, to cooperate.

Further, some of Marks's conduct and testimony at trial suggested his competence.  In fact, when the California Supreme Court considered Marks's competence in his 2003 direct appeal, the court concluded that Marks was "properly found competent to stand trial," *Marks*, 72 P.3d at 1238, and identified certain statements by Marks at trial that the court understood to show his recognition of "the magnitude of the charges he faced and the potential consequences" of conviction, *id.* at 1236–37.  In reaching its determination, the California court addressed the significance to the competence finding of Marks's behavior at the trial.  The court stated that:

> [Marks's] most conspicuous outburst during trial amply proves his ability to understand the proceedings and assist counsel.  When the prosecutor concluded his redirect examination of John Myers, defendant interrupted, "Your Honor, I object.  This person stated it was not me, it was No. 6 who committed the shooting. . . .  He did not even ask."  Discussion among the attorneys and the court revealed that Myers had selected a suspect other than defendant at a photographic lineup.  The prosecutor recognized, however, there was a sound tactical reason for defense counsel's not

> asking Myers about his failure to select
> defendant: Myers had indicated "it was a toss
> up" between defendant and the "number six"
> individual; Myers finally chose the latter.
> Although there was a legitimate reason for
> not asking Myers about his selection at the
> lineup, defendant's comment reflected he
> comprehended not just the nature of the
> proceedings but the state of the People's case
> and its potential deficiencies.

*Id.* at 1237–38 (second alteration in original). This discussion was a reasonable assessment of that portion of the trial record and supports the California Supreme Court's later conclusion on habeas that Marks was competent to stand trial.

After a careful review of the record, the district court similarly—and reasonably—concluded that Marks "behaved at trial as if he understood the nature and purpose of the proceedings against him and was capable in assisting in his defense." *Marks v. Davis*, 112 F. Supp. 3d 949, 981 (N.D. Cal. 2015). So, although Marks's experts "interpreted the guilt and penalty phase transcripts as supporting a finding of incompetence," we agree with the district court that "it would not have been unreasonable for the California Supreme Court to conclude otherwise, based on the record."

Finally, the opinions of Marks's experts were not compelling. Three of the experts had testified in 1992. They were effectively cross-examined at that time, and in some cases their opinions were inconsistent with the opinions of other defense experts. The remaining experts examined Marks in 2002 or 2003, nearly a decade after the trial. Retrospective competency evaluations are disfavored and

may not be "especially probative of whether [a defendant] actually was incompetent at the time of his trial." *Williams*, 384 F.3d at 610.

Ultimately, the California Supreme Court's rejection of this claim was objectively reasonable in light of the jury's competency verdict, the opinion of the trial court judge, the pretrial opinions of defense counsel, and the court's own reading of the trial court record, even if Marks's experts reasonably reached a different conclusion. The question before us is not whether we agree with the California Supreme Court's adjudication of this claim. "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 562 U.S. at 102. Rather, the question under controlling Supreme Court precedent is whether the state court's adjudication of the claim is "so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *Bolin v. Davis*, 13 F.4th 797, 805 (9th Cir. 2021) (quoting *Shinn v. Kayer*, 592 U.S. 111, 118 (2020*)* (per curiam)). The record does not establish an error of this magnitude. Although reasonable judges, reviewing the claim de novo, might well reach a different conclusion than the state court, we conclude that there was a reasonable basis for the state court's rejection of Marks's competency claim.

## II. *ATKINS* CLAIM

Marks contends that he is intellectually disabled and thus that the Eighth Amendment forbids his execution. *See Atkins*, 536 U.S. 304. The district court granted summary judgment to the State on this claim under § 2254(d). *Marks*, 112 F. Supp. 3d at 981–93. We vacate and remand.

## A.  Background

In *Atkins*, the Supreme Court held that the Eighth Amendment forbids the execution of intellectually disabled persons.  536 U.S. at 321.  The Court did not adopt a specific definition of intellectual disability, then known as mental retardation, but cited with approval the clinical definitions set out by the American Association on Mental Retardation (AAMR), now known as the American Association on Intellectual and Developmental Disabilities (AAIDD), and the American Psychiatric Association.  *Id.* at 308 n.3.  These clinical definitions defined intellectual disability as characterized by (1) significantly subaverage intellectual functioning, often established through IQ test scores; (2) existing concurrently with significant limitations in adaptive functioning in areas such as communication, self-care, community use, self-direction, health and safety, functional academics, leisure, and work; and (3) an onset occurring before the age of eighteen.  *Id.* at 308 n.3.  To implement *Atkins*, California adopted Penal Code section 1376, which at the time of the state court proceedings under review defined intellectual disability as "the condition of significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested before the age of 18."  Cal. Penal Code § 1376(a) (2005).  In *In re Hawthorne*, the California Supreme Court held that section 1376 applies to postconviction claims of intellectual disability.  105 P.3d 552, 556 (Cal. 2005).[12]

---

[12] Under current California law, "'[i]ntellectual disability' means the condition of significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested before the end of the developmental period, as defined by clinical standards."  Cal. Penal Code § 1376(a)(1) (2023).

In October 2002, shortly after *Atkins* was decided, Marks filed a habeas petition in the California Supreme Court alleging that he was intellectually disabled and that his execution would constitute cruel and unusual punishment under the Eighth Amendment.  In 2005, the California Supreme Court ordered the trial court to conduct an evidentiary hearing on the claim.  The matter was assigned to Judge Horner, who had presided over Marks's trial and sentencing in 1994.

The trial court conducted a ten-day evidentiary hearing on the *Atkins* claim in 2006.  The record included Marks's academic history.  This evidence showed that: Marks was placed on the middle track rather than the remedial track; took classes in both the middle and remedial tracks; repeated the second grade; skipped the fifth grade (at the request of his mother, who objected that he was too old for the fifth grade); graduated from high school (ranked 280th out of 290 students); and took various junior college classes over a thirteen-year period.  Marks passed about a third of his college courses, including refresher courses in reading, math, and writing (eighteen units); classes in typing and office management (thirteen units); a Swahili class (five units); and physical education (one unit).

The record also contained evidence of Marks's IQ test scores, including several from his childhood.  Marks's IQ was measured as 98 at age six, 95 at age seven, 80 at age eight, 86 at age ten, and 74 at age eleven.  As an adult, Marks scored 60 at age twenty-seven, 74 at age thirty-two, 65 at age thirty-three, 74 at age forty-six, and 72 at age forty-nine.

Marks presented testimony from three mental health experts—Dr. Nancy Cowardin, a psychologist with a specialty in special education, Dr. Ruben Gur, a psychologist

with a specialty in neuropsychology, and Dr. George Woods, a physician specializing in neuropsychiatry. Each provided a professional opinion, based on evidence regarding Marks's intellectual and adaptive functioning before the age of eighteen, that he was intellectually disabled.

Finally, Marks presented declarations, prepared in 2002, from thirty-seven lay witnesses who knew Marks during childhood, in the Navy, or in adulthood. Several of these witnesses described Marks as having experienced a traumatic childhood: that Marks and his siblings feared their father (Jimmie Lee Marks); that Marks's father and mother both regularly whipped the children; that Marks's mother, Sallie, once fired a gun at Marks in anger; that Marks's parents had a strained relationship; that Jimmie Lee physically abused Sallie; that Marks's father was frequently unemployed, often absent, and a poor provider; that Marks's father would throw his children out of the home; and that Marks's parents were heavy drinkers and occasional drug users. At least one witness also testified to the lack of food in the home.

The State presented a single witness—Mike Richard, Mark's cousin. Richard, a lay witness employed in law enforcement, spent many weekends at the Marks home during Marks's childhood. Richard testified that Marks was the eldest of the Marks children and functioned as the "leader" among his siblings; that Marks had a "normal" relationship with his parents; that Marks and his siblings were never beaten by their parents, beyond the "spankings as kids normally get"; that there was always enough food to eat in the Marks home; and that "[i]n my layman view of mental retardation, I saw no sign of mental retardation" during Marks's childhood. Richard did not offer any other testimony about Marks's intellectual functioning, lacked any

specialized "training in dealing with disabled" people, and acknowledged that he knew nothing about Marks's academic performance during their childhoods. He was not asked about Marks's memory, reading ability, or speech, nor about any other specific indicia of Marks's intellectual functioning while growing up.

Following the evidentiary hearing, the trial court denied the *Atkins* claim. At the outset, the court rejected the traumatic picture of Marks's childhood portrayed in the lay witness declarations. The court found that this portrayal— "of a home rife with unrelenting violence, repeated beatings, alcohol abuse, food deprivation, abandonment, and the like"—was not credible in light of Richard's testimony and the testimony of defense witnesses during the penalty phase of the 1994 trial. As the trial court pointed out, the penalty-phase witnesses had described a good home and a fairly normal childhood. Betty Williams, a family friend, testified in 1994 that Marks was "[j]ust like any average child. He did have some problems of growing up from things that were not within his control, but he was a very good child." Willoris Childs, a family friend and the grandmother of Marks's daughter Relisha, testified in 1994 that she had no problems with Marks when he was a child and that he was a pretty good kid before he got out of the Navy. Damon Marks, Marks's younger brother, testified in 1994 that he had "admired Delaney all my life. Best brother out of all my brothers was Delaney." Marks "played a good role" in the family, "the kind of brother that you will want in the family," and was "very helpful" to their mother. He testified that both his parents worked while the children were growing up and that his father and mother both supported the children. He testified that the entire family, including Marks, attended church on a weekly basis. He said that Marks's troubles

started after he got out of the Navy. Effie Jones, a family friend, testified in 1994 that Marks "was a good kid" who presented no problems while he was growing up. She said that Marks was very helpful to his mother and had a good relationship with his siblings. Bobbie Jane Redic, Marks's aunt, testified in 1994 that she never noticed any problems with Marks when he was a child. She said that he had a normal childhood and was "just like any other child." Elaine Marks Bell, Marks's sister, testified in 1994 that Marks had been "a big brother to me. He was always there for me." She said that Marks came from a good home, that his parents expected him to go on and do some good things in life, that their father was a hard-working man, that they had religion in the home, that their parents did not abuse alcohol, that there were no drugs in the home, and that there was plenty of food in the home. She acknowledged some problems— e.g., that their father was not there all the time and could have been more supportive of his sons—but testified that she and Marks grew up in a "great home." Lorraine Winn, Marks's cousin, testified in 1994 that Marks was helpful to his mother and had a fine relationship with his father, that both parents worked and provided for the children, that there was "never" any physical violence in the home, and that Marks "was a good kid" who "never really got into trouble. I had high expectations of him because of the way he was as a kid." She acknowledged that the family "had their ups and their downs" when it came to having plenty of food. The California Supreme Court accurately summarized these witnesses' testimony in its 2003 decision:

> They presented mostly consistent testimony that described defendant as having grown up in a good family environment with religion, where there was no drug or alcohol abuse, no

> domestic violence, and with a father who encouraged education and hard work. Defendant was helpful to his family as a child. He had no more problems than the average child and was never in serious trouble.

*Marks*, 72 P.3d at 1232. In penalty-phase closing argument, the defense argued that Marks had experienced a "normal" childhood and disclaimed any suggestion that Marks had experienced a "dysfunctional family or abusive father." Given the inconsistencies between the 2002 declarations on the one hand and the 1994 testimony and Richard's 2006 testimony on the other, the trial court declined to credit the picture of Marks's childhood presented in the 2002 declarations.[13]

None of the trial witnesses, however, was asked about Marks's intellectual functioning or adaptive behaviors—for example, whether he had learned to talk and read at developmentally appropriate ages or whether he was able to carry out tasks appropriate for his age. Their testimony was therefore of limited relevance to the *Atkins* claim.

Next, the trial court rejected the opinions of Marks's three experts. The court concluded that the experts' opinions were flawed because all three had "relied heavily upon statements contained in the various 2002 declarations . . . relating details of the defendant's supposedly violent upbringing." In addition, the court concluded that all three

---

[13] The trial court also noted that, unlike the 2002 declarants, both Richard and the 1994 witnesses had testified in court and had been subject to cross-examination. The court based its credibility determinations in part on its "own careful, personal observations of each witness."

experts' opinions were flawed because "none of the experts reviewed any of the testimony presented on the defendant's behalf in the 1994 penalty trial, which testimony refuted or contradicted many of these recitations."

The court also provided additional reasons for rejecting the opinions of Dr. Gur and Dr. Cowardin, although not that of Dr. Woods. The court rejected the opinion of Dr. Gur, inter alia, based on his "cavalier refusal" to consider evidence of Marks's efforts to obtain state welfare benefits—attempts that the prosecution highlighted as evidence of Marks's intellectual capacity. The court said:

> [W]hen presented with evidence of the defendant's apparently extensive efforts to obtain general assistance, Dr. Gur acknowledged that he had not reviewed any of these materials, explaining that he didn't need these things, and he could not imagine that any of these materials would change his diagnosis. I find this somewhat cavalier refusal to consider materials which, arguably at least, might demonstrate that the defendant possessed certain 'adaptive skills,' when the possession of or lack of such skills is presumably a significant factor in reaching a diagnosis of mental retardation, to be illustrative of an attitude demonstrating a certain lack of objectivity or impartiality.

With respect to Dr. Cowardin, the court found it highly significant that the expert had presented a slide during her testimony that allegedly misstated the AAMR's clinical definition of intellectual disability. Whereas the slide stated

that the "disability *originates* before age 18," the court believed the AAMR definition required the disability to have *manifested* before age eighteen. The court criticized Dr. Cowardin at length over this perceived misstatement, describing it as a "surprising example of lack of impartiality, and of partisanship," on Dr. Cowardin's part. The court was also convinced that Dr. Cowardin's slide represented a strategic attempt to water down the clinical definition and concluded:

> The fact that the defense team, and Dr. Cowardin in particular, have nevertheless attempted to make these changes is extremely alarming to this Court. It raises the question (which cannot be answered, on this record) of "how many other definitions of critical terms involved in the description and diagnosis of mental retardation or other mental or psychological impairments which have been the subject of testimony in these proceedings has the 'defense team' modified or changed to suit their own purposes?"

The trial court also found the evidence of Marks's IQ test scores and academic history unpersuasive. As to the former, the court observed that, "[o]f the tests administered before the defendant is 18, only one test, at age 11, reflects a test score (74) in the range of 'borderline' mental retardation— and it is at the high end of even this range." The court concluded that "[t]est result[s] which vary this widely, and which (while the defendant is under 18) barely dip into the range for borderline mental retardation on only one single occasion, cannot be considered very 'powerful evidence'

supporting a finding of mental retardation."**[14]**   Turning to Marks's school records, the court acknowledged Marks's "overall poor academic performance, his having to repeat the second grade, teacher comments reflecting his 'immaturity' and that he was 'slow' and 'below grade level skills' at various points in elementary school, and the fact that he graduated from high school near the bottom of his class." But the court noted that Marks "was on the 'medium track' while in school," graduated high school, and "attended classes in a Junior College, where he passed some classes." Viewing the record as a whole, the trial court found that Marks "failed to prove by a preponderance of the evidence that he is mentally retarded within the meaning of *Atkins*." The court therefore denied Marks's habeas petition.

Marks subsequently filed a second state habeas petition, challenging the trial court's rejection of his *Atkins* claim in the California Supreme Court.   The California Supreme Court summarily denied the petition.  Marks then reasserted his *Atkins* claim in his federal habeas petition.  The district court denied relief under § 2254(d)(1) and (2).  *Marks*, 112 F. Supp. 3d at 981–93.**[15]**  Marks challenges that denial on appeal.

---

[14] The state trial court did not address expert testimony opining that the 24-point decline in IQ test scores between ages six and eleven was itself "very important."

[15] Although the district court concluded that the state court's ultimate factual findings were objectively reasonable under § 2254(d)(2), the district court did not meaningfully address the two significant factual errors discussed below.  First, the district court did not address at all the state trial court's glaring factual error in discrediting Dr. Cowardin's opinion on the erroneous ground that she had misstated and manipulated

## B.  Section 2254(d)(2)

Marks first argues that the state trial court's adjudication of his *Atkins* claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).[16]

Marks argues that the trial court unreasonably rejected Dr. Cowardin's opinion on the ground that she misstated the clinical definition of intellectual disability by substituting "originates" for "manifested."  We agree.  Dr. Cowardin's slide and testimony accurately quoted the then-current (10th edition) AAMR definition of intellectual disability. Although Dr. Cowardin's testimony at first cast some doubt on this fact, her later testimony clarified that she had accurately quoted the clinical definition.  The trial court erred by concluding otherwise, and by relying on that error to deem Dr. Cowardin partisan.  The state court's error, and the extremely negative inferences drawn from that purported error, were objectively unreasonable.

---

the clinical definition of intellectual disability, something she had not done.  *Marks*, 112 F. Supp. 3d at 986–93.  Second, the district court dismissed in a footnote the state court's significant factual error in discrediting Dr. Woods's opinion on the faulty ground that he had not reviewed the 1994 penalty-phase testimony, which he had done.  *Id.* at 991 n.26.  We consequently find the district court's analysis of the § 2254(d)(2) issue unpersuasive.

[16] Where, as here, the state supreme court's decision is not accompanied by reasons, we "'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and presume that the state supreme court adopted the lower court's reasoning.  *Wilson*, 584 U.S. at 125.  Because the State has not attempted to rebut that presumption, our focus under § 2254(d) is on the trial court's adjudication of Marks's *Atkins* claim.

Marks argues that the trial court unreasonably rejected Dr. Woods's opinion on the ground that he had not reviewed the 1994 penalty-phase testimony. We again agree. Although Dr. Cowardin and Dr. Gur each testified that they had not reviewed the 1994 testimony, Dr. Woods testified that he had done so. Indeed, Dr. Woods testified about the 1994 testimony at length. The trial court erred by concluding otherwise, and the state court's error was objectively unreasonable.

Marks next challenges the state court's finding that Dr. Gur cavalierly refused to consider records of Marks's efforts to obtain general assistance benefits. We reject this challenge. Dr. Gur testified that he had not reviewed Marks's applications for benefits and that he saw no need to review them. He said that "there is a point as a clinician you have to say, 'Enough, I have what I need and I can make the diagnosis and move on.'" He added that, "sitting here, I can't imagine anything you could tell me now that would have changed my diagnosis." The trial court accurately summarized Dr. Gur's testimony, and the inference the trial court drew from that testimony—that the testimony demonstrated a "lack of objectivity or impartiality" on Dr. Gur's part—was, while debatable, not objectively unreasonable.

Marks argues the trial court questioned Dr. Gur's credibility "on the basis of statements the court either misremembered or concocted." Opening Br. at 79. The trial court, however, merely used quotation marks when paraphrasing Dr. Gur's testimony. This appears to have been a stylistic choice rather than a factual error, and we are not persuaded that it constituted an unreasonable

determination of the facts.[17]   Substantively, the trial court drew reasonable inferences from the record.   As Judge Berzon's partial dissent makes clear, a different factfinder certainly could have drawn different inferences.   But the trial court's inferences were not objectively unreasonable:

 • During the penalty phase of the 1994 murder trial, defense witnesses, including one of Marks's brothers, had described Marks as a good kid with a normal childhood.   On cross-examination during the 2006 *Atkins* hearing, the State asked Dr. Gur whether this 1994 testimony undermined his diagnosis of intellectual disability.   Dr. Gur rejected that suggestion, testifying that he wouldn't trust the 1994 testimony of Marks's brother because Marks's brother might have testified falsely to try to help his brother avoid the death penalty:

> Q:      Doesn't that [1994 testimony] tend to weigh against these observations you made about retardation and PTSD?

---

[17] The trial court may have used quotation marks as "scare quotes," to indicate its disagreement with Dr. Gur's opinions. *See Scare quotes, Am. Heritage Dictionary of the English Language* 1565 (5th ed. 2011) ("Quotation marks used to emphasize a word or phrase or to indicate its special status, especially to express doubt about its validity or to criticize its use."); Shona McCombes, *When to Use Quotation Marks*, Scribbr (Nov. 29, 2022), https://www.scribbr.com/language-rules/quotation-marks/ ("'Scare quotes' are quotation marks used around words that are not a direct quotation from a specific source.  They are used to signal that a term is being used in an unusual or ironic way, that it is borrowed from someone else, or that the writer is skeptical about the term."). Regardless, we infer that the trial court likely knew that it was paraphrasing the testimony.  Thus, we are not persuaded that the court misapprehended the record.

A:     It's quite usual for members of the family not to see a lot of the difficulties that a family has.

Q:     Okay.  It's – I'm sorry.

A:     Also, I would question—since I thought you mentioned this was done during the penalty phase—the brother may have thought that if he described his brother as kind and nice, that it would spare his brother's life.  So I'd be suspicious of that sort of testimony, in view of everything else.

Q:     So are you telling us that you think people provide self-serving or beneficial stuff that's not true in the context of these criminal cases?

A:     Well, I wouldn't blame a sibling for trying to save a brother's life.

The state trial court concluded that Dr. Gur's testimony on this subject undermined his credibility:

Each of the experts were confronted, extensively, on cross-examination, with the substance of the 1994 sworn testimony. Each of the defense experts brushed this testimony aside as a matter of little consequence.  Thus, Dr. Gur proclaimed, at one point in his testimony, that he was "suspicious" of the "self-serving testimony" given by family members at the trial; at another point in his testimony, he dismissed this testimony (which, of course, he had never read) as the

> "rose-colored-glasses outlook of family members." I find these statements both preposterous and at the same time illuminating of a significant lack of objectivity or impartiality on the part of the witness. As I have discussed at some length earlier in this opinion, there is nothing in what the family members and others stated in their 1994 testimony which can reasonably or even remotely be classified as "self-serving." On the contrary, for them to fail to relate circumstances which, if true, might have provided significant evidence in mitigation at a penalty trial is hardly "self-serving."

Putting aside the use of quotation marks to summarize Dr. Gur's testimony, the trial court's reasoning is not objectively unreasonable. The trial court drew permissible inferences from the testimony.

   • In a 2002 lay witness declaration, a childhood friend of Marks by the name of Raymond Bradley described Marks as a talkative child. During cross-examination of Dr. Gur in 2006, the State asked Dr. Gur whether Marks's talkativeness as a child undermined the diagnosis of intellectual disability. Dr. Gur testified that Bradley's declaration was consistent with the diagnosis because Marks likely made no sense when he talked to Bradley:

> Q:     Do you recall a declaration . . . from a friend name[d] Raymond Bradley, [who] described Mr. Marks as a colorful dresser, good talker, careful dresser, loved to talk. Remember that?

A:    Yes.

Q:    . . . How do you think that supports your diagnosis?

A:    I think it's interesting that even in the—the few characterization[s] that he gave, he repeated one twice. And I agree. He's talkative. But if you listen to the content of his speech, it's—it's—it's vacuous. It's very impoverished.

. . .

Q:    Okay. I'm asking you how he was according to Mr. Bradley, how that supports your diagnosis?

A:    So he was talkative.

Q:    Did what he say didn't make sense then?

A:    I would assume it didn't. I don't know for sure, but those kinds of descriptions you often get from friends and family of someone who later developed schizophrenia.

Q:    How would you assume that?

A:    Um, because I've seen now the kind of behavior that would have given that impression. If you spend some time with him, he's very friendly, smiling, talkative—he was when I evaluated him. But I also tried to understand what he said, and as you try yourself, it's very difficult to follow.

Q:      So you think they just ignored how
difficult it was to follow when this
declaration from Raymond Bradley was
prepared.  Is that what you're saying?

A:      That's my best guess at this moment.

. . .

Q:      So why would you conclude that he
didn't make sense to Raymond Bradley when
it doesn't say that?

A:      I didn't say that he didn't make sense
to Raymond Bradley.  He's able to talk and
give the appearance of relating, and I'm—of
course this is conjecture, but I doubt that
there was much depth in those discussions.

The state trial court concluded that Dr. Gur's testimony
further undermined his credibility:

When asked about the declaration of
Raymond Bradley . . . , which in part
described the defendant as a "good dresser"
and "good talker", Dr. Gur testified that the
defendant "probably made no sense" when he
talked to Raymond Bradley.  While experts
are certainly given broad latitude in forming
their opinions, this kind of utter speculation,
wholly unsupported by any evidence, only
casts doubt on the v[e]racity of the witness
(Dr. Gur) in other particulars.  In the words of
the applicable CALCRIM instruction, such
speculation is "unbelievable, unreasonable

[and] unsupported by the evidence."
(CALCRIM 332).

Once again, apart from the unusual use of quotation marks, the trial court's inferences were not objectively unreasonable. Although Dr. Gur ultimately testified that he "didn't say [Marks] didn't make sense to Raymond Bradley," he also testified that he "would assume" that Marks did not make sense to Bradley.

• Another of the 2002 lay witnesses, Chester Langlois, described working alongside Marks in the Navy: "I remember Delaney working around the Hanger Deck talking to the other men and remember him always smiling. He acted like a good-natured kid." During cross-examination in 2006, the State asked Dr. Gur about this testimony: "he described Mr. Marks as a good-natured kid . . . . [I]s there anything in there that helped you diagnose Marks the way you have?" Later, on redirect, Marks's counsel followed up:

> Q:     And he describes being on the hanger deck of this nuclear-powered aircraft carrier and saying: "I remember Delaney working around the hanger deck talking to the other men and I remember him always smiling. He acted like a good-natured kind."
>
> A:     Yes.
>
> Q:     Does that description have any relevance one way or another to your diagnosis of mental retardation?
>
> A:     It implies that the good-naturedness is an act. I think it is [a] perceptive observation that is consistent with mental retardation.

The state court concluded that this testimony also undermined Dr. Gur's credibility:

> When questioned about the 2002 declaration of Chester Langlois, who worked with the defendant in the Navy on board the USS Nimitz, Dr. Gur's attention was called to the declarant's statement that the defendant "acted like a good-natured kid." Dr. Gur testified that this reference implies that the good-naturedness was an "act," and constituted a symptom of mental retardation. I find it hard, if not absolutely impossible, to believe that this conclusion can reasonably be drawn from the simple statement that the defendant "acted like a good-natured kid." If that should be the case, then I suppose that every pleasant and good-natured young person in the world can be so labeled, at least in Dr. Gur's mind.

The trial court drew an objectively reasonable inference.

• After an arrest in 1983, Marks expressed "concern about being evicted while he was in jail." Marks worried that his personal property would be tossed out onto the street. During testimony at the 2006 *Atkins* hearing, Dr. Gur was asked about Marks's concern:

> Q:     Do you recall if there's anything in this file that supports the diagnosis that you made of Mr. Marks both now and as a child?
>
> A:     Yes.
>
> Q:     And what is that?

A: Well, someone in that age not to have anybody who could make sure his stuff is not thrown into the street does not have the kind of vocational, social, and occupational adjustment from a healthy individual.

Q: Now he's 29 years old at this point, right?

A: Yes.

Q: So he was concerned that his property would be put out in the rain and nobody would be able to take care of it, that's what his lawyer said?

A: Yes.

Q: And so do you think that confirms the diagnosis that you made of Mr. Marks in this case?

A: Yes.

The state trial court commented on this testimony:

When questioned about portions of a 1983 Alameda County court record which reflect the defendant's stated fears of being evicted from his premises while he was in jail, Dr. Gur stated that the defendant "should have had a social network to prevent this," and that, because he did not, this confirmed Dr. Gur's diagnosis. This more than somewhat arrogant and presumptuous statement regarding what should be expected of an incarcerated defendant in terms of a 'social

network' tells us more about Dr. Gur, I
submit, than it does about the defendant.

Once again, other than the unorthodox use of quotation
marks, the inferences drawn by the trial court are objectively
reasonable.

• Marks initially had three public defenders representing
him, two men and one woman. Marks did not like the two
male lawyers but had a better relationship with the female
lawyer. Marks made numerous requests to substitute
counsel. When those requests were unsuccessful, he
assaulted his lead (male) attorney—Najpaver—in order to
force the court to allow a substitution of counsel. Marks's
plan succeeded. The State posited at the *Atkins* hearing that
this episode showed that Marks knew what he wanted and
could act rationally in pursuing his preferences. On cross-
examination, Dr. Gur was asked about this episode:

> Q:    . . . there were many times that Mr.
> Marks was unhappy with his lawyers and he
> tried to fire them and get a new lawyer; do
> you remember that?
>
> A:    Yes.
>
> . . .
>
> Q:    Well, if you read his testimony of the
> penalty phase, he said he kicked Najpaver,
> who was then his public defender lawyer, to
> get a better lawyer. That was the only way I
> could do it, was to be granted relief.
>
> A:    That's—
>
> Q:    You weren't aware that he said that?

A:     No.

Q:     And you saw how hard he tried to do it from reading the records and reading other people's reports, legally by filing all these motions and having hearings about that.  Do you remember that?

A:     Yes, I remember.  I think he—my understanding was he couldn't relate to the male lawyers, that there was a—there was a woman lawyer that he was able to relate to, and usually spoke with her or through her.

Q:     So I mean, he was very conscious of what he wanted, right?

A:     I don't know.

Q:     Isn't that what you just said?  He didn't relate well to the men and wanted a woman?

A:     Yeah, I don't know whether that implies that he was very conscious of what he wanted.

Q:     You don't think it does?

A:     No.

Q:     Is there some sinister interpretation to that that you want to share with us?

A:     No.

Q:     So you don't think it shows he got what he wanted?  But you don't have any opinion about what it shows then?

A:    I know that—I'm not sure exactly what you're getting at, but the fact that he wasn't getting along and a lot of his comments about his lawyers appeared quite bizarre.  As I recall, he thought that his lawyers were collaborating with the district attorney who hate—who hated his guts and was after him.  So I wouldn't call that sort of behavior, a conscious perception of someone's needs and the logical pursuit of their accomplishment.

The state trial court cited this exchange as further evidence of Dr. Gur's lack of credibility:

Along the same lines, I submit, is Dr. Gur's description of the defendant's apparent desire, reflected at one point in the Alameda County court files, that a woman lawyer represent him, as being "irrational," and thus presumably supportive of the Doctor's various diagnoses of mental and psychological impairments.  Perhaps this is simply reflective of Dr. Gur's lack of significant exposure to the criminal justice system.  Some persons, charged with crimes, wish male attorneys to represent them. Others prefer female attorneys.  Others have no  preference. The reasons for each choice are unique to each defendant.  But the choice surely cannot, reasonably, be considered per se "irrational," and thus be attributed to mental illness or psychological impairment.

The trial court's findings are not objectively unreasonable. Dr. Gur understood that Marks preferred a female lawyer but rejected the proposition that this preference was the product of conscious planning or logical action on Marks's part. When asked whether Marks's desire for a woman lawyer showed that he was conscious of what he wanted, Dr. Gur responded, "I don't know whether that implies that he was very conscious of what he wanted." And Dr. Gur questioned the assertion that Marks's attack of Najpaver was a logical means of obtaining a substitution of counsel. The trial court drew inferences with which a fairminded jurist might agree.

Marks argues that the trial court unreasonably found that the three defense "expert witnesses, in particular Dr. Gur, all relied, and relied very heavily, in support of their diagnoses of various mental and psychological impairments of the defendant, including mental retardation, upon the factual allegations contained in a number of declarations filed by various people in the year 2002, at the beginning the habeas corpus proceedings which have led to this hearing." This finding was objectively reasonable. Although only Dr. Gur relied heavily on the declarations in making his diagnosis of intellectual disability, all three experts relied heavily on the declarations in making their various diagnoses.

Relatedly, Marks challenges the trial court's finding that the lay witnesses' statements regarding Marks's traumatic childhood—that "Marks was regularly and severely beaten by both of his parents; that the defendant was regularly beaten by his siblings; that other siblings and friends of the defendant were beaten in the defendant's presence; that the defendant was forced to engage in fistfights with his siblings; that the defendant watched his mother being severely beaten by his father on frequent occasions; that the defendant was, at various times, thrown out of his home by

his parents, was not allowed to return, and was abandoned by them; that the defendant suffered from acute food deprivation over a long period of time; that the defendant, on at least one occasion, was chased by his mother with a gun; and that both of the defendant's parents continually and regularly abused alcohol"—"contributed very heavily to the experts' opinions and diagnoses of various mental impairments, including mental retardation."   Marks's argument is persuasive.  Only Dr. Woods and Dr. Gur relied significantly on Marks's traumatic childhood in their diagnoses of various mental impairments, and only Dr. Gur relied significantly on Marks's traumatic childhood in diagnosing intellectual disability.[18]   In making that diagnosis, all three experts relied principally on Marks's IQ scores, academic records, and neuropsychological testing—not Marks's traumatic childhood.

Marks argues that the trial court unreasonably found that "many" of the lay witnesses who submitted declarations in 2002 also had testified at trial and that "[t]he testimony of those witnesses at the penalty phase of the trial in 1994 contradicts, in very significant and important respects, many of the allegations contained in the declarations filed in 2002."  We agree with Marks that the trial court significantly overstated both the existence and the relevance of these contradictions.   Of the thirty-seven lay witnesses who submitted declarations in 2002, only eight had testified in 1994, and of those eight, only two or three directly

---

[18] Dr. Gur testified about certain "risk factors" that contributed to Marks's diagnosis of intellectual disability, including: family poverty; malnutrition; traumatic brain injuries brought about by frequent beatings and fistfights; domestic violence in the household; parental drug use; parental immaturity; parental rejection of caretaking; parental abandonment; child abuse and neglect; and inadequate family support.

contradicted their 1994 testimony in their 2002 declarations.[19]   But the trial court accurately found that the picture of Marks's childhood painted by the 2002 declarations differed from the image portrayed in both the 1994 testimony and Richard's 2006 testimony.   Thus, the trial court's decision to reject the 2002 declarations' portrayal of Marks's childhood was objectively reasonable.

Although we do not agree with all of Marks's assertions, we agree with his contention that the trial court's findings with respect to Dr. Cowardin and Dr. Woods were objectively unreasonable.  We also agree with Marks that, in light of these errors, the trial court's adjudication of Marks's *Atkins* claim was "based on" an objectively unreasonable determination of the facts under § 2254(d)(2).   Under our precedent, "where [1] the state courts plainly misapprehend or misstate the record in making their findings, and [2] the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can

---

[19] Marks's sister, Elaine Marks Bell, testified in 1994 that there were no drugs in the home and that her parents did not abuse alcohol.  In 2002, the same witness submitted a declaration describing her parents' alcohol and drug use.  Marks's cousin, Lorraine Winn, testified in 1994 that there was "never" any physical violence in the home.  In 2002, the same witness submitted a declaration stating that Marks's mother used to whip the children with a belt and once fired a gun at Marks.  Marks's brother, Damon Marks, testified in 1994 that he had a very good relationship with Marks while he was growing up, that both parents worked, that both parents were in the home, that everyone on the family attended church each week, and that both parents supported the children in the family.  In 2002, the same witness submitted a declaration stating that most members of the family did not attend church, that his father seldom worked and his mother supported the whole family with her job, that his parents whipped the children and threatened them with a gun, and that no one in the family, including Marks, was supportive of him or helped him along.

fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable." *Taylor*, 366 F.3d at 1001.[20]

Both prongs of the *Taylor* formulation are satisfied with respect to Dr. Woods. First, the trial court plainly misapprehended the record in stating that Dr. Woods had not reviewed the 1994 penalty-phase testimony. Second, this misapprehension goes to a material factual issue central to Marks's claim—Dr. Woods's credibility. As noted, the trial court offered only two reasons for rejecting Dr. Woods's opinion: (1) he had relied on the 2002 lay witness declarations and (2) he had not reviewed the 1994 penalty-phase testimony. The state court was wrong about the second reason. And it is unlikely that the first reason would have been sufficient to disregard Dr. Woods's professional opinion because the lay witness declarations did not figure prominently in Dr. Woods's conclusion that Marks was intellectually disabled. Dr. Woods relied on a broad range of information in making his diagnosis,[21] and his ultimate

---

[20] *Cf. Hughes v. United States*, 584 U.S. 675, 685–86 (2018) (holding that a sentence is "based on" the Sentencing Guidelines so long as the Guidelines range was "a basis" for the sentencing decision or "part of the framework the district court relied on in imposing the sentence").

[21] *See* Woods Decl. ¶ 7 ("In order to complete this evaluation, and render an opinion regarding the reference questions, I conducted of Mr. Marks at San Quentin State Prison; and reviewed voluminous materials, including a comprehensive social history and psychosocial assessment of Mr. Marks, prepared by Julie Kriegler, Ph.D.; pre-offense medical records, which included records from Highland Hospital, Alameda Hospital, and pre-offense custodial records from Alameda County Jails and the California Department of Corrections (CDC); school records and available military records; the results of interviews of family members, friends, teachers, and associates of Mr. Marks; neuropsychological

conclusion that Marks was intellectually disabled rested not on the lay witness declarations regarding Marks's traumatic childhood but on other factors—principally, (1) Marks's student records; (2) Marks's IQ scores, including the precipitous decline in those scores between ages six and eleven; and (3) the uncontradicted neuropsychological testing results showing impairments in Marks's brain functioning.

Both prongs of the *Taylor* formulation are also satisfied with respect to Dr. Cowardin. The trial court plainly misapprehended the record by finding that Dr. Cowardin had misstated or manipulated the clinical definition of intellectual disability. It was the trial court that misstated the AAMR definition. Further, the court's misapprehension went to a material factual issue that was central to Marks's *Atkins* claim—Dr. Cowardin's credibility. Like Dr. Woods, Dr. Cowardin testified that Marks was intellectually disabled. There was no expert testimony contradicting these opinions. Thus, Dr. Cowardin's credibility was both a material factual issue and central to Marks's claim. The trial court erred, moreover, in finding that Marks's traumatic

---

evaluations performed by Karen Froming, Ph.D. and David R. Stein, Ph.D.; Dr. Stein's testimony in Mr. Marks's competency trial in 1992; competency evaluations prepared by Karen Gudiksen, M.D., Fred Rosenthal, M.D., Ph.D.[,] Jules Burstein, Ph.D.[,] and Hyman Silver, M.D.; the testimony of Dr. Burstein and Josalyn Harris, a vocational rehabilitation counselor at Mr. Marks's 1992 competency hearing; a tape recording identified by the Alameda Police as an interview with Mr. Marks, but which Mr. Marks denies participating in; and numerous court transcripts, including Mr. Marks's statements in support of his motions to obtain new trial counsel and transcripts of his testimony at the guilt and penalty phases of his trial.").

childhood "contributed very heavily" to Dr. Cowardin's diagnosis of Marks's intellectual disability.

We cannot agree with the Judge Nelson's suggestion that the state court's significant factual errors were "inconsequential." The three mental health experts who examined Marks and testified at the *Atkins* hearing uniformly concluded that he was intellectually disabled, and this conclusion was fully consistent with Marks's IQ scores and academic records. Significantly, the State offered no mental health expert of its own, leaving the professional opinions of Dr. Cowardin, Dr. Woods, and Dr. Gur both corroborated and unrebutted. Thus, the credibility of these experts was of the utmost importance to the state court's adjudication of Marks's *Atkins* claim.

Yet the state court dismissed the opinions of these experts on highly dubious grounds. The state court was dead wrong in concluding that Dr. Cowardin had misstated the clinical definition of intellectual disability; she had in fact quoted the current AAMR definition verbatim. And this error figured prominently in the state court's analysis. Indeed, the state court seized upon the erroneously perceived misstatement of the clinical definition not only to accuse Dr. Cowardin, falsely, of "partiality" and "partisanship," but also to impugn *the entire "defense team"*:

> far more significant to me[] is the fact that this "defense team" does not hesitate to change material portions of the definition of mental retardation to suit their purpose. **The definition of mental retardation is not subject to modification by the 'defense team' or anyone else.** . . . The fact that the defense team, and Dr. Cowardin in particular,

have nevertheless attempted to make these changes is extremely alarming to this Court. It raises the question (which cannot be answered, on this record) of 'how many <u>other</u> definitions of critical terms involved in the description and diagnosis of mental retardation or other mental or psychological impairments which have been the subject of testimony in these proceedings has the "defense team" modified or changed to suit their own purposes? . . .

. . . Another troubling question arises: <u>why</u> was the "defense team" so concerned about changing the definition of mental retardation, to remove the word "manifested", and substitute the word "originates"? . . . **[N]o wonder the defense team had to get rid of the word "manifest". No wonder the defense team had to substitute a word such as "occur", or "originate", neither of which carry, any of the requirements of being readily perceived by the senses and especially by the sight, being easily understood and recognized by the mind, being obvious, being evident, being shown or displayed, all of which are part of the definition of "manifest".**

(Emphases in original.) Judge Nelson's suggestion that the state court's error was inconsequential is impossible to reconcile with the state court's own treatment of the issue. The state court excoriated the defense over this wholly manufactured issue over the course of five single-spaced

pages in a twenty-six-page decision. It is difficult to imagine how the state court's misapprehension of the record could have figured more prominently in the court's analysis.

Nor can the state court's error regarding Dr. Woods be dismissed as inconsequential. The state court was flatly wrong in concluding that Dr. Woods had not reviewed the 1994 penalty-phase testimony. Dr. Woods had reviewed it, and indeed testified about it at length. The state court, moreover, placed extraordinary weight on its false conclusion that Dr. Woods had not reviewed the testimony:

> **[I]ncredibly, none of the experts reviewed any of the testimony presented on the defendant's behalf in the 1994 penalty trial, which testimony refuted or contradicted many of these recitations.** I simply find it <u>astonishing</u>, and totally, wholly <u>unreasonable</u> and <u>unprofessional</u>, for these experts to base their opinions of a variety of mental and psychological impairments, including mental retardation, upon the circumstances of the defendant's youth, and yet to <u>steadfastly refuse to read or even consider</u> the sworn testimony of the <u>very people who presumably would know the defendant best</u> at this exact period of his life, and who presumably would be the very best, the most reliable, the most accurate 'historians' (to use the expert's own term) of these circumstances. That makes the testimony of these expert witnesses, to use the words of the California Supreme Court in criticizing the defense expert testimony in the

various competency proceedings, **"<u>not</u>
<u>compelling</u>"** and **"<u>suspect</u>".**

(Emphases in original.)  This harsh criticism, of course, *had
absolutely no application to Dr. Woods at all*.  Yet the state
court plainly gave it enormous weight in rejecting Dr.
Woods's opinion.  Furthermore, as noted, the state court
offered no other significant reason for rejecting Dr. Woods's
professional, corroborated, and unrebutted opinion that
Marks was intellectually disabled.

This is not a close case.  The state court misstated the
record on material issues central to Marks's *Atkins* claim and
central to the state court's analysis, fatally undermining both
the state court's factfinding process and its ultimate
conclusions.  *See Taylor*, 366 F.3d at 1001.  Thus, the state
court's adjudication of Marks's *Atkins* claim was based on
an unreasonable determination of the facts.  Because
§ 2254(d)(2) is satisfied, Marks is entitled to de novo review
of his *Atkins* claim.  *See Kipp*, 971 F.3d at 955.  We remand
to the district court for this purpose.

## C.  Section 2254(d)(1)

Our conclusion that § 2254(d)(2) is satisfied makes it
unnecessary for us to address Marks's alternative contention
that the trial court unreasonably applied *Atkins* within the
meaning of § 2254(d)(1).  Because the parties have briefed
this issue, however, we exercise our discretion to reach it.

Marks first argues that the trial court unreasonably
applied *Atkins* by treating Marks's IQ test score of 74 as
falling at the high end of borderline intellectual disability.
We disagree.  Much has been clarified about intellectual

disability since *Atkins*.[22]    But at the time it was not uncommon to refer to IQ test scores of 74 as indicative of "borderline" mental retardation.  *Atkins* itself reflected this uncertainty.  *Compare Atkins*, 536 U.S. at 308 n.3 ("'Mild' mental retardation is typically used to describe people with an IQ level of 50–55 to approximately 70." (citing the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders 42–43 (4th ed. 2000))), *with id.* at 309 n.5 ("It is estimated that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." (citing 2 Kaplan & Sadock's Comprehensive Textbook of Psychiatry 2952 (B. Sadock & V. Sadock eds. 7th ed. 2000))).   Notably, two of Marks's own experts described IQ test scores of 74 as reflecting "borderline" intellectual disability.    Dr. Froming stated that "IQs . . . between 70 and 79 are considered borderline, and those of 69 or below are considered mentally retarded," and Dr. Cowardin noted that Marks's IQ test score of 74 in 1989

---

[22] The AAIDD, for example, currently defines intellectual disability as "a condition characterized by significant limitations in both intellectual functioning and adaptive behavior that originates before the age of 22." "Defining Criteria for Intellectual Disability," American Association on Intellectual and Developmental Disabilities, https://www.aaidd.org/intellectual-disability/definition (last visited June 25, 2024).  Under current AAIDD standards, "an IQ test score of around 70 or as high as 75 indicates a significant limitation in intellectual functioning." *Id.*; *see Brumfield*, 576 U.S. at 315 ("Accounting for th[e] margin of error, Brumfield's reported IQ test result of 75 was squarely in the range of potential intellectual disability."); *Hall v. Florida*, 572 U.S. 701, 723 (2014) ("[W]hen a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits.").

had resulted in a diagnosis of "borderline mental retardation."

Marks alternatively argues that the trial court unreasonably applied *Atkins* by relying on Richard's testimony that, "[i]n my layman view of mental retardation, I saw no sign of mental retardation" during Marks's childhood years. Marks argues that "it is unsurprising that Mr. Richard did not detect clinical signs of his cousin's disability when they were both still children" because individuals with mild intellectual disability often are not distinguishable from children without intellectual disability. Marks, however, cites no authority for the proposition that indications of intellectual disability are necessarily undetectable by lay people during an individual's middle or late childhood. The Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000), upon which Marks relies, states only that children with intellectual disability may be difficult to distinguish from other children during "preschool years (ages 0–5 years)." Richard's frequent stays with the Marks family occurred while the children were between the ages of approximately six and sixteen. Given the then-current clinical definitions requiring intellectual disability to originate or manifest before age eighteen, *see Atkins*, 536 U.S. at 308 n.3, it was not unreasonable for the state court to give some weight to Richard's testimony.

## III. JUDICIAL BIAS

Marks contends that Judge Horner, who oversaw the *Atkins* hearing, was biased against him. After the state court summarily denied this claim, the district court denied habeas relief under § 2254(d). We affirm.

Due process guarantees a criminal defendant the right to a fair and impartial judge. *See Hurles v. Ryan*, 752 F.3d 768,

788–90 (9th Cir. 2014); *Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995). As the Supreme Court explained in *In re Murchison*, "[a] fair trial in a fair tribunal is a basic requirement of due process," and "[f]airness of course requires an absence of actual bias in the trial of cases." 349 U.S. 133, 136 (1955). We apply "a presumption of honesty and integrity in those serving as adjudicators." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).

Here, the trial court leveled unusually harsh criticism at Marks's attorneys and witnesses. The court concluded that Marks's lay witnesses' descriptions of Marks's childhood were untruthful; that Marks's experts had acted in a "wholly unreasonable and unprofessional" manner; that Marks's attorneys had "deliberately withheld" unfavorable information from the experts; that Dr. Gur's statements were alternatively "preposterous," "arrogant," and "presumptuous"; and that Dr. Cowardin, in coordination with the defense team, had intentionally misstated the clinical definition of intellectual disability to manipulate the outcome of the proceedings. But "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Liteky*, 510 U.S. at 555.[23] The California Supreme Court reasonably could have concluded that Judge Horner did not "display a deep-seated favoritism or antagonism that would make fair

---

[23] Although *Liteky* addresses the statutory recusal standards for federal judges under 28 U.S.C. § 455(a), we have looked to the decision in assessing bias claims under the Due Process Clause, *see Bayliss v. Barnhart*, 427 F.3d 1211, 1215 (9th Cir. 2005), and both parties have relied on the decision in their briefs. We therefore assume without deciding that *Liteky* informs our analysis of Marks's due process claim.

judgment impossible." *Id.* There thus was a reasonable basis for the state court's rejection of this claim.[24]

## IV. FIFTH AMENDMENT

Marks contends that he did not knowingly waive his Fifth Amendment right not to testify at trial. The district court denied this claim under § 2254(d). We affirm.

### A. Background

Marks elected to testify at trial. Before permitting him to do so, the trial court engaged Marks and his counsel in a colloquy regarding whether Marks understood his right not to testify:

> THE COURT: Let me inquire. You had also indicated that it was your intention at least as of yesterday that the defendant himself would testify on his own behalf.
>
> MR. THEWS: That's correct. He wants to testify, and we want him to testify.
>
> THE COURT: If that is going to happen, then there are some things we need to cover. One of them is I need to be sure that the defendant understands he has a constitutional right obviously to testify in his own behalf. He also has a right not to testify and to rest on the state of the evidence. And I want to be sure that he's aware of both of these

---

[24] The majority concludes that the trial court made factual errors in adjudicating the *Atkins* claim. These errors, standing alone, are not persuasive evidence of bias. *See Liteky*, 510 U.S. at 555 ("[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion.").

rights. . . . And that if he . . . avails himself of his constitutional right not to testify the People would not be able to comment on that in any way. And I would propose to read the jury instruction that deals with the defendant's declining to testify so that he's fully aware of that. Let me ask you as his attorneys, have you explained to Mr. Marks [that] he has both constitutional rights? . . .

MR. THEWS: I think we have discussed that with him over a period of a number of months.

. . .

THE DEFENDANT: I'm listening. Somebody hasn't asked me a question. They're just citing the law. *You're telling me I have the right to remain silent if I wish to*, if I want to voice my opinion or voice my testimony I can but nobody has directly given me a direct statement what's given to Mr. Marks to respond, so I haven't responded to that question.

THE COURT: I appreciate that. Back to you, Mr. Thews. Why don't you tell the court in terms of the nature of your discussions with his client regarding his constitutional rights.

MR. THEWS: *The terms of the constitutional rights over the past months we have discussed those matters with Mr. Marks. And the question I was about to ask Mr.*

*Marks is did you understand those discussions that we had regarding the constitutional right to remain silent?*

THE COURT:  Mr. Marks, did you hear Mr. Thews's question?

THE DEFENDANT:  Yes, I did.

THE COURT:  Did you want to respond?

THE DEFENDANT:  Yes, *I'm—*

THE COURT: Very well.

THE DEFENDANT:  *—confident to what Mr. Thews said.  And my choice is to take the stand and have on the record what actually took place*, and note that I'm not dark complected, I'm not jet black, I'm medium brown with the Fu Manchu, and I want to proceed on that.  That I was—

THE COURT:  May I speak directly to Mr. Marks in this regard?

MR. THEWS:  Yes.

THE COURT:  Mr. Marks, you have indicated it is your intention to testify.

THE DEFENDANT:  Yes.

THE COURT:  I presume you understand you have a right to do that, you have a right to take the stand and testify in your own behalf, you understand you have that right?

THE DEFENDANT:  Yes.

THE COURT: You also understand you have a right not to do that, you have a right to remain there at the counsel table and put the People to the proof, and that is to rely on the state of the evidence and force the People to prove their case without any proof. Do you understand?

THE DEFENDANT: At this point I don't believe the state of evidence, I have enough to pronounce on the presumption of innocence on the defendant or I wouldn't be taking the stand. Are you comfortable with what I'm saying, sir?

THE COURT: All right. And let me indicate to you, if you decide not to testify, that is if you decided to sit there at counsel table and remain silent and put the People to the proof I would give this instruction to the jury. So I want you to understand what I will tell the jury, if you decided not to testify. "A defendant in a criminal trial has a constitutional right not to be compelled to testify. You must not draw any inference from the fact that a defendant does not testify. Further you must neither discuss this matter nor permit it to enter into your deliberations in any way. In deciding whether or not to testify the defendant may choose to rely on the state of the evidence and upon the failure, if any, of the People to prove beyond a reasonable doubt every essential element of the charge against him. No lack of testimony on defendant's part will make up for a failure

of proof by the People so as to support a finding against him on any such essential element."

So you understand if you decide not to testify that's what the jury would be told by me. Do you understand that?

THE DEFENDANT:  *Yes, I understand that.*

THE COURT:  I would also instruct the district attorney that they would not be allowed to comment on that fact in any way in their closing argument.  In other words, Mr. Burr would not be able to call the jury's attention to the fact that the defendant had not testified.

Do you understand that?

THE DEFENDANT:  Well, at this point I have been deprived of the right of freedom of speech, and that's my right.  I'm willing to get on the stand and speak because I want to tell them what I have been suffering as a victim.

THE COURT:  I appreciate that, Mr. Marks. I want to make sure—just a second.  I want to make sure you understand what your rights are here.  And in particular do you understand that if you decided not to testify, Mr. Burr could not comment on that point, that is he could not point out Mr. Marks has the right not [to] testify.

THE DEFENDANT:  He has the right, he has brought out my whole career.

THE COURT:    Do you understand that you—you understand if you decide not to testify that he could not comment on that fact, that he could not comment to the jury that they should—

THE DEFENDANT:  I think—I think open field if he took the stand.

THE COURT:  *Do you understand?*

THE DEFENDANT:  I'm fully competent, magistrate.  *I'm fully comprehend of what you say, magistrate and my wishes are to take the stand.*

THE COURT: Okay.  Thank you very much. Okay.  Thank you.

In a state habeas petition, Marks alleged that the state trial court violated his Fifth Amendment right to remain silent and his Sixth Amendment right to a fair trial because the record was inadequate to show that he knowingly and intelligently waived the right to remain silent.  He further alleged that the trial court ultimately "abandoned repeated efforts to determine Mr. Marks's degree of understanding of the legal consequences of a decision not to testify."  The California Supreme Court summarily rejected this claim, and the district court denied relief under § 2254(d), holding that there was a reasonable basis for the state court to conclude that Marks understood his right not to testify.

## B.  Discussion

A criminal defendant has a "Fifth Amendment right not to testify at trial."  *United States v. Olvera*, 30 F.3d 1195, 1198 (9th Cir. 1994).  As the Supreme Court explained in *Harris v. New York*, "[e]very criminal defendant is privileged to testify in his own defense, or to refuse to do so."  401 U.S. 222, 225 (1971).  The waiver of the right to testify "must be knowing and voluntary," *United States v. Pino-Noriega*, 189 F.3d 1089, 1094 (9th Cir. 1999), but a court has no duty to advise the defendant of this right or "ensure that an on-the-record waiver has occurred," *United States v. Edwards*, 897 F.2d 445, 446 (9th Cir. 1990).  Although these principles apply to the waiver of the right to testify, we assume that they extend to a waiver of the right *not* to testify, because "the right not to testify counterpoises the right to testify, and the exercise of one is the waiver of the other."  *United States v. Joelson*, 7 F.3d 174, 178 (9th Cir. 1993) (quoting *United States v. Martinez*, 883 F.2d 750, 757 (9th Cir. 1989), *vacated on other grounds*, 928 F.2d 1470 (9th Cir. 1991)).  The State does not contend otherwise.

As a threshold matter, Marks argues that his waiver of his right not to testify at trial was unknowing because he was mentally incompetent to stand trial.  We recognize that competence to stand trial and the knowing waiver of one's Fifth Amendment rights present related, if not identical, inquiries.  As the Supreme Court explained in *Cooper v. Oklahoma*, "[c]ompetence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including . . . the right to testify on one's own behalf or to remain silent without penalty for doing so."  517 U.S. 348, 354 (1996) (quoting *Riggins v. Nevada*, 504 U.S. 127, 139–40 (1992) (Kennedy, J., concurring in the judgment)).  The state court finding that

Marks was competent to stand trial, however, was not objectively unreasonable, 28 U.S.C. § 2254(d)(2), and has not been rebutted "by clear and convincing evidence," *id.* § 2254(e)(1).

More broadly, we hold that there was a reasonable basis for the California Supreme Court to conclude that Marks's waiver of his right not to testify was knowing and voluntary. Marks was unequivocal in stating that he wished to testify; defense counsel agreed with Marks's decision to testify; defense counsel had discussed the right not to testify with Marks over a period of months; Marks understood that he had "the right to remain silent if I wish to"; Marks confirmed that he had understood his discussions with counsel regarding the constitutional right to remain silent; Marks understood that he had a right to testify; and Marks understood that, if he did not testify, the jury would be instructed that it could not infer guilt from his silence. Marks focuses on the fact that the trial court attempted four times with limited success to confirm that Marks understood that, if he did not testify, the prosecution would not be able to comment on his silence.[25]  But on the court's fourth try Marks said, "I'm fully competent, magistrate. I'm fully comprehend of what you say, magistrate and my wishes are to take the stand."  The state court reasonably could have concluded that this statement demonstrated Marks's understanding of the consequences of his decision.

---

[25] Although "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege," *Colorado v. Spring*, 479 U.S. 564, 574 (1987), we assume for purposes of our analysis that Marks's failure to comprehend that the prosecution could not comment on his decision not to testify would have rendered his waiver unknowing.

## V. FUNDING FOR A MENTAL HEALTH EXPERT

Marks argues that he was denied his Sixth Amendment right to the effective assistance of counsel because his trial attorneys failed to seek the appointment of a mental health expert during trial. He contends that an expert would have concluded that he was incompetent to stand trial, which would have triggered a second competency hearing at which he would have been deemed incompetent. The district court denied this claim under § 2254(d). We affirm.

### A. Background

Defense counsel moved once on the eve of trial and twice during trial for a second competency determination. The trial court denied the motions and the trial proceeded. Defense counsel Thews later stated that, "[b]ecause the court denied our motions for psychiatric examination, we had no choice but to go forward."

In a state habeas petition, Marks argued that counsel's failure to do more to prompt a second competency determination amounted to ineffective assistance of counsel. He pointed out that California Penal Code section 987.9(a) authorizes defense counsel in capital cases to petition a trial judge, other than the presiding judge, for funds to hire experts for the preparation or presentation of the defense.[26]

---

[26] In 1994, Penal Code section 987.9(a) stated:

> In the trial of a capital case or a case under subdivision (a) of Section 190.05 the indigent defendant, through the defendant's counsel, may request the court for funds for the specific payment of investigators, experts, and others for the preparation or presentation of the defense. The application for funds shall be by

He argued that counsel could have employed this provision to obtain funding to retain a mental health expert who would have concluded that he was incompetent to stand trial. He argued that this finding would have triggered a second competency hearing, *see People v. Stankewitz*, 648 P.2d 578, 584 (Cal. 1982), at which he would have been found incompetent.

The California Supreme Court summarily rejected this claim, and the district court denied relief under § 2254(d).

## B. Discussion

To establish ineffective assistance of trial counsel, Marks must show both deficient performance and prejudice. *See Strickland*, 466 U.S. at 687. To establish prejudice, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

---

affidavit and shall specify that the funds are reasonably necessary for the preparation or presentation of the defense. The fact that an application has been made shall be confidential and the contents of the application shall be confidential. Upon receipt of an application, a judge of the court, other than the trial judge presiding over the case in question, shall rule on the reasonableness of the request and shall disburse an appropriate amount of money to the defendant's attorney. The ruling on the reasonableness of the request shall be made at an in camera hearing. In making the ruling, the court shall be guided by the need to provide a complete and full defense for the defendant.

Cal. Penal Code § 987.9(a) (1994). The current version of section 987.9(a) is substantially similar.

We agree with the district court that there was a reasonable basis for the California Supreme Court to deny this claim. Even assuming counsel performed deficiently by failing to retain an expert under section 987.9(a), the state court reasonably could have concluded that there was no reasonable probability that Marks would have been found incompetent at a second competency hearing. In July 1992, a jury found Marks competent to stand trial notwithstanding testimony to the contrary from several mental health experts. The state court reasonably could have concluded that a second hearing would have produced the same result.

## VI.  FAILURE TO OBJECT TO CLOSING ARGUMENT

Marks contends that his attorneys provided ineffective assistance of counsel by failing to object to statements made by the prosecution during penalty-phase closing argument. The district court declined to consider this claim on the grounds that Marks neither "properly presented this argument to the state courts" nor "properly raise[d] this argument in his federal habeas petition." We agree.[27]

---

[27] We grant a certificate of appealability. *See Gonzalez v. Thaler*, 565 U.S. 134, 140–41 (2012) ("When, as here, the district court denies relief on procedural grounds, the petitioner seeking a [certificate of appealability] must show both 'that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'" (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000))).

## A. Background

During penalty-phase closing argument, the prosecution suggested that the mental health experts who had examined Marks had found nothing wrong with him:

> One way or another Mr. Wies, who is a very good lawyer, will try and convince at least one of you, that Delaney is crazy and you got to spare his life because he's sick.
>
> There is nothing, nothing medically or psychiatrically wrong with this man down here at the end of the table at all. You look at his conduct, you say that's crazy. You hear him perform in here, you say that's crazy. That's because he doesn't operate by our rules. If there was anything, anything psychiatrically or medically wrong with him, you would have heard it. He's got two lawyers. He had a battery of three lawyers before he assaulted Mr. Najpaver. He's had investigators. And as he said when he testified there were a whole lot of psychiatrists and psychologists that examined him. And if there was anything, a scintilla of anything that his lawyers could have grabbed a hold of to bring to you, they would have. They would have.
>
> . . .
>
> . . . If there was anything wrong that his attorneys could bring to point to this man to say here he's crazy, and here's the proof of it, you would have heard it. Wild horses

couldn't keep them from bringing it in here. They would love to have something like that, love to.  Not to mention the other disorders that are, you know, paranoid schizophrenia.

The prosecution added:

This is what his attorneys would love to see, that there be something here that they could give to you, something that you could grab ahold of, that they could argue to you is some explanation for his behavior.  And there isn't any.  There isn't.

I mean, how many shrinks examined him? There's Karen Gudiksen, Dr. Cormos, Dr. Silver, Burstein, Rosenthal, there was—well, half a dozen, as he said himself, a lot.  And of those six, not one could come up with one of those, a mental disease or a defect, that could say that he could not conform his conduct or that he didn't know what he was doing.  Not one.[28]

---

[28] The last paragraph alluded to California Penal Code section 190.3(h), which at the time stated:

In determining the penalty, the trier of fact shall take into account any of the following factors if relevant: . . . (h)  Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the affects of intoxication.

Cal. Penal Code § 190.3(h) (1994).  The current version is identical.

The psychiatrists and psychologists who examined Marks found that he did, in fact, have psychological problems. Dr. Karen Gudiksen had been appointed by the court to examine Marks in 1992. She concluded that he "has an organic mental disorder with psychotic features," and was "a mentally incompetent person" within the meaning of Penal Code section 1368. Dr. Rosenthal was also appointed by the court to examine Marks in 1992. He found "indications of a major mental disorder" and agreed with Dr. Gudiksen that Marks "was not mentally competent to stand trial." Dr. Stein examined Marks in 1992 and found significant brain impairments. Dr. Burstein examined Marks in 1992 and agreed with Drs. Gudiksen and Rosenthal that he was incompetent to stand trial. The prosecution was aware of these findings. Accordingly, the prosecution's arguments arguably were subject to an objection. *Cf. Miller v. Pate*, 386 U.S. 1, 3–7 (1967) (deeming a conviction invalid where "[t]he prosecution deliberately misrepresented the truth").

The defense did not object to the prosecution's statements, but Wies did respond to them during the defense closing:

> And I want to address first of all some of Mr. Burr's remarks yesterday and today, in terms of rebuttal. I don't want them just left unanswered.

> Is Delaney crazy? We've never said so. We have never intimated, I would hope, by anything we've done, to make you think that there was an insanity defense or that he was not responsible for his actions. We've never said that. But you have seen Delaney here in

court, you've seen him on the stand on three occasions, and you can form your own opinions about what Delaney is all about.

Mr. Burr said there was nothing medically wrong with Delaney. Well, you heard Delaney tell you from the stand that he has epilepsy, that he suffers from a seizure disorder, that he takes an anticonvulsive medication. Well, to take a page from Mr. Burr's book, you can bet if that weren't true, Mr. Burr would have 16 tons of evidence of medical records showing you we've examined all these and there's no evidence he's taking medication.

That's not an excuse. Nobody is saying spare Delaney's life because he has an epileptic condition or he's taking medication. We're not offering it for that purpose. We're offering it to show this is what Delaney is.

In his state habeas petition, Marks alleged that "[t]he prosecutor intentionally and affirmatively misled the jury to believe mistakenly that petitioner did not suffer from any mitigating mental or emotional condition, and that no evidence existed of a mitigating mental illness or disorder." He set out the prosecution's statements in detail and explained why the statements were contrary to facts in the record. Then, some sixty pages later, the petition alleged as follows:

By virtue of defense counsel's failures, including, but not limited to, the (a) failure to conduct a minimally competent investigation

and prepare and present evidence in mitigation, (b) failure to conduct a minimally competent investigation and prepare and present evidence in rebuttal of aggravation evidence, (c) *failure to diligently advocate on [behalf] of petitioner during prosecutorial misconduct and closing arguments*, (d) failure to conduct a minimally competent investigation and prepare and present impeachment evidence for key prosecution witnesses, and (f) failure to challenge inadmissible and prejudicial evidence, Mr. Marks was denied the effective assistance of counsel, and the fair and reliable determination of penalty to which he was entitled.

(Emphasis added.)    The California Supreme Court summarily denied this claim, after which Marks reasserted the claim, in substantially the same form, in his federal habeas petition.  The district court declined to consider the claim, citing Marks's failure to properly present the claim to the state courts or plead the claim in his federal petition.

## B. Discussion

We agree with the district court's analysis.  First, "exhaustion of state remedies requires that petitioners 'fairly presen[t]' federal claims to the state courts in order to give the State the 'opportunity to pass upon and correct alleged violations of its prisoners' federal rights.'"  *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (per curiam) (alteration in original) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)).  To fairly present a claim, a petitioner must "present the substance of his claim to the state courts, including a

reference to a federal constitutional guarantee and a statement of facts that entitle the petitioner to relief." *Kyzar v. Ryan*, 780 F.3d 940, 947 (9th Cir. 2015) (quoting *Gulbrandson*, 738 F.3d at 992). Here, Marks alleged only counsel's "failure to diligently advocate on [behalf] of petitioner during prosecutorial misconduct and closing arguments." He did not specifically allege *what* counsel purportedly failed to do—*object* to the closing argument discussed some sixty pages earlier. Marks thus did not fairly present this claim to the state courts. *See Rose v. Palmateer*, 395 F.3d 1108, 1111 (9th Cir. 2005) ("In addition to requiring specificity in pleading the federal nature of a claim, we also require a petitioner to articulate the substance of an alleged violation with some particularity."); *see also Davis v. Silva*, 511 F.3d 1005, 1009 (9th Cir. 2008) ("[T]o exhaust the factual basis of the claim, the petitioner must . . . provide the state court with the operative facts, that is, 'all of the facts necessary to give application to the constitutional principle upon which [the petitioner] relies.'" (last alteration in original) (quoting *Daugharty v. Gladden*, 257 F.2d 750, 758 (9th Cir. 1958))).

Second, we agree with the district court that Marks failed to properly plead this claim in his federal petition. Rule 2(c) of the Rules Governing § 2254 Cases states that a habeas petition must "(1) specify all the grounds for relief available to the petitioner" and "(2) state the facts supporting each ground." This rule "demand[s] that habeas petitioners plead with particularity." *Mayle v. Felix*, 545 U.S. 644, 656 (2005). Here, Marks's federal habeas petition, like his state petition, failed to specify what it was that his attorneys failed to do—*object* to the prosecution's closing argument mentioned in the petition some fifty pages earlier. Marks therefore failed to adequately plead the claim.

In sum, the district court properly declined to consider this claim.[29]

## CONCLUSION

We affirm the judgment of the district court on Marks's competency, judicial bias, Fifth Amendment, and ineffective assistance of counsel claims. We vacate the judgment with respect to Marks's *Atkins* claim and remand for de novo review of the claim. Each party shall bear its own costs on appeal.

**AFFIRMED IN PART; VACATED IN PART; REMANDED.**

---

[29] Even if the claim were properly presented, it would be unlikely to succeed. Marks did not present evidence of mental illness or argue that his mental condition was a reason for leniency. Defense counsel thus had little reason to object to the prosecution's misleading characterizations of Marks's psychological history, and counsel reasonably could have elected to address the prosecution's misstatements during defense closing rather than by objecting. *See Cunningham v. Wong*, 704 F.3d 1143, 1159 (9th Cir. 2013) ("[B]ecause many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the wide range of permissible professional legal conduct." (quoting *United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993))); *see also Weeden v. Johnson*, 854 F.3d 1063, 1069 (9th Cir. 2017) ("Our review of the [state court's] holding that . . . counsel was not deficient is 'doubly' deferential, because *Strickland* requires state courts to give deference to choices made by counsel and AEDPA in turn requires us to defer to the determinations of state courts." (quoting *Harrington*, 562 U.S. at 105)).

BERZON, Circuit Judge, concurring in part and dissenting in part:

The majority holds that "the state court's adjudication of Marks's *Atkins* claim was based on an unreasonable determination of the facts" as to expert testimony by Dr. Cowardin and Dr. Woods. Maj. Op. at 97. But the state court's similar treatment of Dr. Gur's expert testimony, the majority says, was reasonable. *See id.* at 77-78. I strongly disagree. I am also of the view that the state court's factual findings as to other aspects of the record on the *Atkins* issue were similarly unjustifiable.

Given the state court's unreasonable factual determinations in discrediting the *Atkins* testimony, I join the majority in reversing the district court's decision rejecting Marks's *Atkins* claim and concur in remanding to the district court on that issue. As the majority does not reach the merits of the *Atkins* issue, I shall not do so in this dissent. Instead, I confine this dissent to explaining why the relevant record for *de novo* review should include Dr. Gur's expert evidence, as well as some additional material. I therefore dissent from Part II to the extent reflected in this dissent, including those portions of the majority opinion that discuss the state court's treatment of Dr. Gur's credibility.[1]

## I.

I agree with the majority that the state court's adjudication of Marks's *Atkins* claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). In support of its

---

[1] I concur in Parts I, III, IV, V, and VI of the majority opinion.

§ 2254(d)(2) holding, the majority opinion details the state court's patently unreasonable factual determinations as to the expert testimony of Dr. Cowardin and Dr. Woods. *See* Maj. Op. at 76-97. I agree with that thorough analysis, which highlights the state court's egregious treatment of those two experts' testimony, including discrediting them based on the court's outright false statements about their conclusions and on its own misrepresentations of the factual record. Moreover, the state court repeatedly relied on its factual errors about Dr. Cowardin's and Dr. Woods's testimony to draw unwarranted negative and personal inferences about their motivations and to reject entirely their credibility as expert witnesses.

The state court's treatment of both Dr. Cowardin and Dr. Woods evinces a pattern of mischaracterization and bias in assessing the testimony of Marks's expert witnesses. It is unsurprising that, as described below, this disturbing pattern extends to the state court's treatment of Marks's third expert witness as well.

## II.

Marks argues that the state court unreasonably rejected Dr. Gur's expert testimony and conclusions. He is right.

The state court discredited Dr. Gur's professional opinion based on its findings that he had made several statements with which the court took issue. But the record shows that Dr. Gur *did not make* five statements the state court attributed to him; that Dr. Gur's testimony, in context, did not have the meaning the state court assigned to it; and that the erroneously attributed statements constituted the bulk of the court's basis for rejecting Dr. Gur's opinion and his credibility as an expert.

## A.

Throughout its discussion of Dr. Gur, the state court consistently attributes certain language, demarcated with quotation marks, to Dr. Gur. Time and again, however, the quoted language attributed to Dr. Gur *did not come from Dr. Gur*.

The majority opinion discounts Marks's concerns with the state court's treatment of Dr. Gur by framing the court's use of "quotation marks when paraphrasing Dr. Gur's testimony" as a quirk—a "stylistic choice rather than a factual error." Maj. Op. at 77. The state court, the majority contends, "[s]ubstantively . . . drew reasonable inferences from the record" in drafting the language it framed as direct quotes by Dr. Gur. *Id* at 78.

I cannot so lightly "[p]ut[] aside the use of quotation marks to summarize Dr. Gur's testimony." *Id.* at 80. Concluding that "the [state] trial court's reasoning is not objectively unreasonable" while disregarding that the court represented that Dr. Gur said things he did not say compromises not only grammar but common sense. *Id*. There is just no reason a judge, trained in the need for detail and accuracy, as well as in basic writing principles, would put quotation marks around testimonial language if he did not mean that the speaker meant to convey *those words*, not something sort of similar but lacking the nuance and qualifications of what was actually conveyed.

The state court's misuse of quotation marks reveals three specific problems with its analysis of Dr. Gur's testimony. First, the state court, after treating the misattributed statements as direct quotations from Dr. Gur, rejected his testimony based on the often-reductive phrasings of the misquotations. The misquotations stand in stark contrast to

Dr. Gur's actual nuanced testimony. Second, even accepting the misattributed quotes as a bizarre attempt by the state court to demarcate paraphrased testimony, the resulting quotations so significantly misrepresent Dr. Gur's actual opinions as to be wholly unreasonable, and reveal the state court's lack of engagement, either by design or through incompetence, with the substance of his expert testimony. Third, in some instances, even if Dr. Gur had offered the testimony the state court attributed to him (which, again, he did not), such testimony would have been reasonable on the factual record and so provides no support for the state court's venomous attack on Dr. Gur's credibility. The upshot is that each of the five direct quotations the state court wrongly attributed to Dr. Gur cannot bear the weight the state court placed on it to impugn Dr. Gur's character and reject his expert testimony. The majority opinion's attempts to explain and to place in context the state court's discussions cannot camouflage the unreasonableness of these errors.

*First*, during Dr. Gur's evaluation of Marks's family members' testimony at the 1994 trial, it was a lawyer—not Dr. Gur—who described such testimony as "self-serving." Dr. Gur's own comments on the 1994 testimony—which was perceived to be in tension with later declarations filed in 2002—did not "dismiss[]" or "brush this most significant evidence aside . . . with the back of his hand," as the state court stated. Instead, Dr. Gur offered a reasoned explanation as to why the testimony of family members in 1994 may not be probative of Marks's actual childhood circumstances, noting both that "[i]t's quite usual for members of the family to not see a lot of the difficulties that a family has" and that Marks's brother "may have thought that if he described his brother [Marks] as kind and nice, that it would spare his brother's life." Accordingly, Dr. Gur provided an opinion on

the weight of Marks's family members' 1994 testimony sensitive to the context in which that evidence was offered.

Even if Dr. Gur *had* described the 1994 testimony as "self-serving," that would hardly have been, as the state court asserted, "preposterous" or indicative of a "significant lack of objectivity or impartiality." Providing positive testimony about Marks during the 1994 penalty phase of his trial could fairly be described as "self-serving" in three ways. Doing so would have served his family members' interests by (1) portraying Marks in a more favorable light in court, (2) avoiding reliving or publicly revealing the difficult circumstances of their own childhoods, and (3) cohering with the defense lawyer's chosen strategy of emphasizing Marks's family members' enduring support for him. The state court's conclusion that "there is nothing in what the family members and others stated in their 1994 testimony which can reasonably or even remotely be classified as 'self-serving'"—and its discounting of Dr. Gur's testimony based on erroneously attributing that description to him—is thus unreasonable. Put another way, and contrary to the majority's conclusion, the state court's analysis did not "dr[a]w permissible inferences from [Dr. Gur's] testimony." Maj. Op. at 80.

*Second*, Dr. Gur did not testify that a description of Marks as "act[ing] like a good-natured kid" while in the Navy "constituted a symptom of mental retardation," as the state court found. Instead, Dr. Gur testified that such a description was actually an observer's "perceptive observation that is consistent with," not a symptom of, "mental retardation," presumably because individuals with mental retardation, like anyone else, can appear, or make an effort to appear, good-natured to others. The state court's negative inference from its misattributed quote—namely,

that Dr. Gur was biased and providing compromised testimony because he believed that "abnormal or normal behavior [from Marks would] both corroborate the diagnosis of mental illness"—was patronizing and unreasonable.

*Third*, Dr. Gur did not say that Marks "probably made no sense" when he spoke to declarant Raymond Bradley. Instead, after a lawyer asked him "why [he] would . . . conclude that [Marks] didn't make sense to" Bradley, Dr. Gur expressly replied, "I didn't say that [Marks] didn't make sense to" the declarant. Nothing in the record indicates that Dr. Gur made the probabilistic remark attributed to him. Moreover, the state court disparaged Dr. Gur's testimony as "utter speculation, wholly unsupported by any evidence" that "casts doubt on [his] v[e]racity." But Dr. Gur's testimony, as solicited by the lawyer examining him, emphasized the tentative nature of his opinions in this area and his reluctance to offer a conclusion about Marks's coherence when speaking to Bradley. As recorded in the transcript, the same attorney asked Dr. Gur, "Did what he [Marks] say didn't make sense then?," to which Dr. Gur replied, "I would assume it didn't. I don't know for sure," while making clear that he was offering only "[his] best guess at this moment" rather than a concrete assessment of the interaction between Marks and Bradley. Honesty about what one does not know but considers possible, grounded in professional experience, does not "cast[] doubt on [one's] v[e]racity." To the contrary, Dr. Gur was completely forthright about the extent of his knowledge and the basis for his "guess."

*Fourth*, as the district court found, Dr. Gur never said that Marks "should have had a social network to prevent" eviction; Dr. Gur instead testified about specific indicia of healthy adjustment, noting that "someone in that age [who

does] not . . . have anybody who could make sure his stuff is not thrown into the street does not have the kind of vocational, social, and occupational adjustment from a healthy individual." The point was not that Marks should have been able to prevent an eviction but, rather, that Marks should have been able to find someone to help him with his "stuff." The state court's misattributed quote fails to reflect Dr. Gur's actual testimony in other ways, too; having "anybody" (i.e., an individual) to help, as Dr. Gur referenced, is quite different from having a full "social network" to assist, as the court referenced instead. The state court's description is thus inaccurate both as a direct quote and as a paraphrase of this section of Dr. Gur's testimony. Based on this false gloss, the state court offered an overblown and emotionally laden characterization of the quoted language it misattributed to Dr. Gur, inexplicably describing his testimony as "arrogant and presumptuous."

*Finally*, as the district court also recognized, there is simply "no support" in the record for the state court's finding that Dr. Gur described as "irrational" a purported desire by Marks for a woman lawyer.

To begin, contrary to the majority opinion's suggestion that "Dr. Gur understood that Marks preferred a female lawyer" generally, Maj. Op. at 89, the testimony demonstrates that Dr. Gur correctly understood Marks's preference for working with a *particular* woman lawyer on his legal team. What Dr. Gur said was that "there was a woman lawyer that [Marks] was able to relate to and usually spoke with her or through her." Here, too, the state court's errors compound: even if Dr. Gur *had* made the statement that Marks had a preference for woman lawyers that was irrational, it would not have supported the state court's unreasonable extrapolation—with no reference to any

specific   condition   or   diagnostic   criterion—that
characterizing Marks's purported desire as irrational would
be "presumably supportive of [Dr. Gur's] various diagnoses
of mental and psychological impairments." The state court
thus acted unreasonably in faulting Dr. Gur for unwarranted
implications that the court speculated would attach to a
remark he did not even make.

The state court also disregarded Dr. Gur's testimony on
Marks's relationship with his lawyers more generally.
During a colloquy about Marks's ability to identify goals and
rationally pursue them, Dr. Gur noted that Marks's
delusional belief that "his lawyers were collaborating with
the district attorney" to hurt his case did not reflect "a
conscious perception of someone's [Marks's own] needs and
the logical pursuit of their accomplishment." That is a far cry
from the state court's summary of Dr. Gur's testimony,
which was that Dr. Gur had "attributed" Marks's desire for
a woman lawyer "to mental illness or psychological
impairment," and faulted him for that attribution.

To summarize: in all five instances, Dr. Gur did not make
the statements the state court attributed to him, whether the
attributed statements are viewed as quotations, as presented,
or—inconsistently with the format the state judge repeatedly
used—as paraphrases. The state court erred by concluding
otherwise, and its errors were objectively unreasonable.
Moreover, the state court evinced a consistent pattern of
hyperbolic and inaccurate characterizations of the testimony
it falsely attributed to Dr. Gur, layering unreasonable error
upon unreasonable error to arrive at a seriously distorted
view of both the factual record and Dr. Gur's credibility.
This pattern is consistent with the state court's treatment of
Dr. Cowardin's and Dr. Woods's expert evidence, reviewed
in   detail   in   the   majority   opinion.   As   with   its

mischaracterization of testimony by those two experts, the state court did not comprehend—or at least did not take into account and substantively consider—what Dr. Gur *actually* said in his extensive, detailed, and nuanced testimony.

Accordingly, the state court's factual determinations as to Dr. Gur, including its rejection of his expert testimony, warrant no deference.[2]

## B.

Both prongs of the *Taylor* formulation for determining when a state court's fact-finding is unreasonable for purposes of 28 U.S.C. § 2254(d)(2) are satisfied with respect to Dr. Gur. *See Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004), *abrogated on other grounds as stated in Murray v. Schriro*, 745 F.3d 984, 999-1000 (9th Cir. 2014). First, the

---

[2] The state court also faulted Dr. Gur for not reviewing certain evidence about Marks's efforts to obtain general assistance benefits. The majority suggests that the state court's inference—namely, that Dr. Gur's testimony about those records demonstrated his "lack of objectivity or impartiality"—"was, while debatable, not objectively unreasonable." Maj. Op. at 77. I disagree.

Dr. Gur testified that, despite not reviewing the documents themselves, he recalled "references to [Marks's efforts to receive benefits]" in the records he did review. He noted that, "in cases where you have a real tough diagnostic dilemma"—in contrast to Marks's case—"obviously those things [viz. documentation of efforts to obtain benefits] can help," but that "there is a point as a clinician [when] you have to say, 'Enough, I have what I need and I can make the diagnosis and move on.'" Dr. Gur was familiar with the type of records at issue even if he had not reviewed the documents themselves, and he was entitled to determine that Marks's case did not pose a "real tough diagnostic dilemma" in which those records might be probative. Even if Dr. Gur's professional judgment about the need to review those documents was misplaced, it is not at all clear why such error would indicate that he lacked objectivity or impartiality.

state court "plainly . . . misapprehend[ed] the record" by finding that Dr. Gur made five statements he did not make and then faulting him as partisan and lacking objectivity based on those misattributed statements. *Taylor*, 366 F.3d at 1001. Second, this misapprehension "goes to a material factual issue . . . central" to Marks's claim: Dr. Gur's credibility. *Id.* Like Dr. Woods and Dr. Cowardin, Dr. Gur testified that Marks was intellectually disabled. There was, again, no expert testimony contradicting these opinions. Thus, Dr. Gur's credibility was both a material factual issue and central to Marks's claim.

Nor can the state court's errors as to Dr. Gur be dismissed as "inconsequential," as Judge Nelson's dissent suggests. Nelson Dissent at 142. The state court was repeatedly wrong in attributing several statements to Dr. Gur, whose testimony did not contain the remarks in question, either directly or as paraphrase. As discussed above, Dr. Gur did not make any of the five statements for which the state court faulted him, and the state court's understanding of what he did say is belied by the content and context of his statements. Nonetheless, the state court placed significant weight on its false conclusions that Dr. Gur had made those statements, repeatedly suggesting that they showed that Dr. Gur was deliberately misreading record evidence to confirm his diagnosis of Marks as intellectually disabled regardless of what the evidence properly indicated, and that Dr. Gur was therefore not credible. With regard to the five statements it falsely attributed to Dr. Gur, the state court declared that:

- On the wrongly attributed statement about Marks's family members' 1994 testimony as self-serving: "I find these statements both preposterous and at the same time

illuminating of a <u>significant lack of objectivity or impartiality on the part of the witness</u>," such that they "confirm[] a growing suspicion in my mind that Dr. Gur, and to an extent both of the other experts, are <u>not</u> wholly impartial, and <u>not</u> wholly objective, but are instead, to a certain degree (in Dr. Gur's case, perhaps to a rather considerable degree) simply partisans attempting to achieve a partisan result.";

- On the wrongly attributed statement that Marks's perceived good-naturedness was symptomatic of intellectual disability: "I find it hard, if not absolutely impossible, to believe that this conclusion can reasonably be drawn from the simple statement that the defendant 'acted like a good-natured kid.' If that should be the case, then I suppose that every pleasant and good-natured young person in the world can be so labeled, at least in Dr. Gur'[s] mind. To pursue this a bit further: this example reflects a pattern of opinions apparently shared by Dr. Cowardin—that statements such as that of Mr. Langlois, that the defendant acted like a 'good natured kid' or (in the case of Dr. Cowardin, that of Jude Bullock, who stated that the defendant 'talked so much') are examples of the defendant '<u>masking</u>' his mental or psychological deficits. I submit that what this kind of analysis produces is a 'no-win' situation by the person being evaluated—abnormal or bizarre behavior is of course suggestive of mental or psychological impairments; seemingly normal behavior is simply an 'act' (according to Dr. Gur), or an attempt to 'mask' one's deficits (according to Dr. Cowardin). Either way, abnormal or normal behavior both corroborate the diagnosis of mental illness. Joseph Heller could not have said it better. But while this kind of approach had a kind

of ironic humor in Heller's novel 'Catch 22;' it has far more serious overtones in our setting, where it seems not to matter how the defendant acts—normal or abnormal, ordinary or bizarre—it all leads to the same result with these expert witnesses: a diagnosis of mental illness or psychological impairment.";

- On the wrongly attributed statement that Marks probably made no sense when speaking to a certain declarant: "[T]his kind of utter speculation, wholly unsupported by any evidence, only casts doubt on the v[e]racity of the witness (Dr. Gur) in other particulars," because "such speculation is 'unbelievable, unreasonable [and] unsupported by the evidence.'";

- On the wrongly attributed statement that Marks should have had a social network to prevent eviction: "This more than somewhat arrogant and presumptuous statement regarding what should be expected of an incarcerated defendant in terms of a 'social network' tells us more about Dr. Gur, I submit, than it does about the defendant."; and

- On the wrongly attributed statement that Marks's purported desire for a woman lawyer was irrational: "But the choice surely cannot, reasonably, be considered per se 'irrational,' and thus be attributed to mental illness or psychological impairment.".

The state court's unsupported criticism of Dr. Gur did not speak to his credibility at all, because Dr. Gur had not made the statements nor conveyed the meaning on which the state court based its excoriating and often highly personal critique. Yet the state court gave that criticism significant weight in rejecting Dr. Gur's testimony, relying on the

misattributed statements to devalue Dr. Gur's credibility and impugn him personally as partisan and fixated on reaching a predetermined result regardless of the evidence. The state court, of course, offered similarly unsupported criticism of Marks's other experts to undermine their credibility, which the majority *does* identify as unreasonable. Dr. Gur's testimony, along with Dr. Cowardin's and Dr. Woods's, should therefore be considered in a *de novo* analysis of Marks's *Atkins* claim.

## III.

I part ways with the majority's *Atkins* analysis on other fronts as well.

The state court found that the three expert witnesses, and "in particular Dr. Gur, all relied, and relied very heavily, in support of their diagnoses of various mental and psychological impairments of the defendant, including mental retardation, upon the factual allegations contained in a number of declarations filed by various people in the year 2002." The majority holds that this finding was objectively reasonable.

The record, however, contradicts that description of how Dr. Cowardin, Dr. Woods, and Dr. Gur reached their respective diagnoses. The three experts did each refer to the 2002 declarations occasionally, but did not do so specifically with respect to the issue of mental disability.[3] Instead, as the

---

[3] The 2002 lay declarations about Marks's childhood and family circumstances were included in Marks's state habeas petition (and cited in his federal habeas petition) primarily to support his claims concerning competency and ineffective assistance of counsel. The *Atkins* claims in those petitions did not specifically cite to any of the 2002 lay declarations

majority elsewhere acknowledges,[4] the experts primarily relied upon Marks's IQ testing, academic records, teacher evaluations, and statements about his childhood behavior to make their mental disability diagnoses, as opposed to depictions of Marks's childhood circumstances.[5] The state court's characterization of these experts' reliance on the 2002 declarations for *Atkins* purposes as "very heav[y]," and its resulting rejection of their assessments as "not compelling" and "suspect," was without doubt objectively unreasonable.

It was also unreasonable for the state court to reject wholesale the 2002 declarations' portrayal of Marks's childhood as difficult and traumatic. The majority concedes that the state court "significantly overstated both the existence and the relevance" of contradictions between penalty-phase testimony from 1994 and lay declarations filed in 2002 concerning Marks's childhood circumstances. Maj. Op. at 90. Thirty-seven lay witnesses submitted

---

or the information in them (although there was, as is usual, a general incorporation of other allegations).

[4] *See* Maj. Op. at 89-90. The majority opinion features an internal tension, deeming it "reasonable" that the state court found the expert witnesses relied heavily on the 2002 declarations in making their diagnoses, *id*. at 89, but "persuasive" that lay witness statements about Marks's childhood did not contribute heavily to the same experts' diagnoses, *id.* at 90.

[5] For example, Dr. Cowardin discussed teacher comments in school records documenting Marks's learning difficulties, slowness, immaturity, and need for remedial work. Dr. Woods discussed Marks's difficulties with language, including "a tremendous amount of verbal output . . . consistent with the types of impairments you see in frontal lobe disease." And Dr. Gur discussed Marks's "history of significant limitations in social, academic and occupational functioning" in the context of Marks's "significantly subaverage" IQ metrics.

declarations in 2002, of whom only two or three, according to the majority, contradicted their earlier testimony from 1994. Moreover, twenty-nine of those witnesses had not testified in 1994. The state court responded to the fact that, at most, three witnesses' 2002 statements on Marks's childhood diverged from their 1994 testimony by systematically discounting *all thirty-seven* lay witnesses' declarations as to this issue. There is simply no reasonable basis for rejecting as not credible, without a hearing enabling an in-person assessment of credibility, such a large number of sworn declarations submitted by individuals who had never previously testified and so had no earlier testimony to contradict. I therefore cannot agree with the majority that the state court's "decision to reject the 2002 declarations' portrayal of Marks's childhood was objectively reasonable." *Id.* at 91.[6]

More importantly, the trial court's emphasis *with regard to the Atkins claim* on family circumstances during Marks's childhood was misplaced. The lay testimony and

---

[6] The state court, after quoting extensively from the CALJIC penalty phase jury instructions' technical discussion of "mitigating circumstance[s]," declared that "[t]here is simply no conceivable reason or motive why these witnesses" would not mention "powerful evidence in mitigation" about Marks's childhood circumstances, "**if those facts existed**." I note again that there were rational incentives for witnesses testifying at the 1994 penalty-phase trial to soften or omit aspects of Marks's difficult childhood. *See infra* Section II.A. Further, Marks's lay witnesses can hardly be faulted for failing to realize in 1994 that presenting Marks's adverse childhood circumstances in full at the penalty phase of his trial "might have provided significant evidence in mitigation." They are not lawyers and cannot be expected to know what factors can be mitigating in a capital trial's penalty phase. Nor is there any basis for supposing that the lay witnesses would have read or been apprised of the jury instructions before testifying.

declarations about Marks's childhood—in both 1994 and 2002—were not focused on Marks's intellectual function, as would be relevant to the *Atkins* analysis. Factual disputes about Marks's parents' treatment of him and his siblings are not directly pertinent to Marks's intellectual functioning and adaptive behavior as a child; at most, those circumstances might shed light on why he developed as he did, not how he actually developed. Instead, the gravamen of Marks's *Atkins* claim rests on the unanimous testimony of the three expert witnesses who testified to Marks's intellectual limitations based on the evidence regarding his intellectual and adaptive functioning as a child, including school and testing records and declarations from childhood acquaintances and teachers concerning his development, behavior, and academic performance.

## IV.

Marks's *Atkins* claim was considered exhaustively in the 2006 state court proceedings, but the state court's determination of the facts, as I have explained, was patently unreasonable. The majority, after determining that Marks satisfies the requirements of § 2254(d)(2), remands to the district court for *de novo* review. Although I might prefer to decide the *Atkins* issue ourselves, I concur in that disposition. As the majority does not reach the merits of the *Atkins* claim, I do not do so in this dissent. Instead, I emphasize my view that the district court's review on remand should include the full record properly before it, unconstrained by the state court's avalanche of unreasonable factual determinations, including Dr. Gur's expert evidence and the additional material discussed above. To that extent, I respectfully dissent.

R. NELSON, J., concurring in part, dissenting in part:

The majority properly rejects almost all of Marks's habeas claims.  I concur in Parts I, II(A), II(C), and III–VI of the majority opinion.  I disagree, however, with the conclusion in Part II(B) that the record as it relates to Dr. Cowardin and Dr. Woods suggests petitioner may be intellectually disabled and thus ineligible for the death penalty. *See Atkins v. Virginia*, 536 U.S. 304 (2002).  This claim has been rejected by multiple courts as non-meritorious.  We give deference to that holding by the state court.  And the majority properly rejects the most relevant of Marks's arguments even for this claim and I join those portions including the discussion in full as to Dr. Gur. Ultimately, however, the majority strains both the record and the law, giving Marks another bite at his decades-old *Atkins* claim.  I therefore dissent.

I

Delaney Marks was convicted of capital murder by a jury in 1994.  At the penalty phase trial, Marks's counsel presented evidence that Marks had a good childhood but turned violent after traumatic events later in life.  This narrative was supported by seven lay witnesses who knew Marks as a child.  The witnesses testified that Marks grew up in a good family environment with no drug or alcohol abuse, no domestic violence, and an encouraging father.  No evidence was presented that Marks was intellectually disabled, despite this being a potentially legitimate mitigating factor at sentencing. *See, e.g.*, *Williams v. Taylor*, 529 U.S. 362, 370–71, 395–96 (2000) (evidence of intellectual disability is "significant mitigating evidence" and defense counsel was constitutionally ineffective for failing to introduce such evidence at the penalty phase of

petitioner's capital murder trial).  The jury sentenced Marks to death.

Eight years later, the Supreme Court issued its landmark decision, *Atkins v. Virginia*.  *Atkins* held that the execution of an intellectually disabled criminal constitutes cruel and unusual punishment.  536 U.S. at 321.  *Atkins* did not define how a state court should adjudicate a defendant's intellectual disability, *see id.* at 317, but gave states the "task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences."  *Id.* (cleaned up).

California enacted Penal Code section 1376 to satisfy *Atkins*'s directive.  *In re Hawthorne*, 105 P.3d 552, 554 (Cal. 2005).  Section 1376 "sets forth the standards and procedures for determining whether a defendant against whom the prosecution seeks the death penalty is [intellectually disabled] within the meaning of *Atkins*."  *Id.*  Postconviction claims "should be adjudicated in substantial conformance with" section 1376.  *Id.*

In 2005, at Marks's request, the Supreme Court of California ordered the State "to show cause in Alameda County Superior Court . . . why [his] death sentence should not be vacated . . . on the ground that he is [intellectually disabled] within the meaning of *Atkins v. Virginia*."  This was the same trial court (and judge) that conducted Marks's original criminal and penalty phase trials in 1994.

The trial court conducted an evidentiary hearing.  The hearing substantially conformed to the procedure outlined in section 1376.  The burden was on Marks "to show by a preponderance of the evidence that [he] suffered from (1) significantly subaverage general intellectual functioning [that manifested] prior to age eighteen; and (2) deficits in

adaptive behavior that manifested prior to age eighteen." The trial court was "not . . . bound by the opinion testimony of expert witnesses or by test results, but [was permitted to] weigh and consider all evidence bearing on the issue." *Hawthorne*, 105 P.3d at 555.

Marks presented evidence in support of his claim of intellectual disability. To support his subaverage intellectual functioning claim, Marks relied on his IQ scores between the ages of six to eleven and his school performance records. For his subaverage adaptive functioning claim, Marks relied on the declarations of three lay witnesses who knew him as a child.

Marks also presented expert testimony—including from Drs. Gur, Cowardin, and Woods—each of whom concluded that Marks was intellectually disabled. These experts "relied very heavily" upon declarations submitted by lay witnesses in 2002. And those witnesses had relied on evidence from decades earlier. Some of these same lay witnesses had testified contradictorily at the penalty phase of Marks's original trial.

In 2006, the trial court denied Marks's petition. The trial court made two factual determinations. First, Marks failed to prove by a preponderance of the evidence that he had significantly subaverage intellectual functioning that manifested before age eighteen. The trial court reasoned that Marks's IQ scores were inconclusive and could instead support that Marks had average intellectual ability "with at least equal weight and equal convincing force." The trial court also analyzed Marks's school records and determined that they, too, did not support a finding that Marks had "subaverage" intellectually functioning. Marks, for

example, "managed to graduate" from high school, which cut against his claim.

Second, the trial court determined that Marks failed to prove by a preponderance of the evidence that he had subaverage adaptive functioning that manifested before age eighteen. This determination was especially influenced by the credibility of Marks's lay witness declarants. In 2002, lay witnesses who knew Marks as a child submitted declarations in support of his habeas petition. These declarants depicted Marks's childhood as dark and traumatic. For example, Marks's sister Elaine stated in her declaration that both of her parents abused alcohol and that she was in a car accident with her mother because her mother was driving drunk and high. Many of these same declarants, however, had testified at the penalty phase of Marks's original 1994 trial. At that time, these lay witnesses testified that Marks had a good childhood. The lay witnesses included Elaine, who testified in 1994 that she and Marks grew up in a "great home" and that neither of their parents abused alcohol.

The trial court directly weighed the credibility of the 1994 live testimony against the 2002 declarations. The trial court determined that the live witnesses in 1994 were telling the truth then and that in 2002 they (and the other declarants) were not. This is because, the trial court reasoned, if Marks's childhood had indeed been as dark and traumatic as described in the 2002 declarations, the same declarants who testified in 1994 would have had incentive to so state. Evidence of intellectual disability was a legitimate mitigating factor against the death penalty even then. *See, e.g.*, *Williams*, 529 U.S. at 371, 395–96. But they did not.

Because it rejected the credibility of the 2002 declarants, the trial court relied on the testimony of Marks's cousin, Michael Richard, to assess whether Marks had subaverage adaptive functioning before age eighteen. Richard testified that he never personally saw any signs of intellectual disability in Marks. Richard's testimony was corroborated by the live testimony given by Marks's friends and family members, which the trial court determined to be truthful, at the penalty phase of Marks's original trial. The trial court also found Richard to be truthful, with no apparent bias against Marks.

The trial court also found that Marks's expert witnesses—Drs. Gur, Cowardin, and Wood—lacked credibility for several reasons. Most significantly, all three "relied heavily upon statements contained in the various 2002 declarations" but not upon the 1994 live testimony. This was the primary reason the trial court found the expert witnesses' testimony "not compelling" and "suspect." For example, the trial court noted that Dr. Gur's statements that the 1994 testimony was "self-serving" and "the 'rose-colored-glasses outlook of family members'" were "both preposterous and at the same time illuminating of a significant lack of objectivity or impartiality on the part of [Dr. Gur.]"

Marks sought a second petition for habeas relief on his *Atkins* claim. The Supreme Court of California summarily denied his *Atkins* claim in 2010. Marks now brings his habeas claims to federal court.

The district court granted summary judgment for the State on Marks's intellectual disability claim because the trial court's decision was objectively reasonable. *Marks v. Davis*, 112 F. Supp. 3d 949, 993 (N.D. Cal. June 25, 2015).

The district court held that the trial court's determination that Marks's IQ scores and school records did not support that Marks had subaverage intellectual ability before age eighteen was not objectively unreasonable. *Id.* at 989. The district court also explained that the trial court's determination that the 1994 testimony was the most reliable indicator of Marks's childhood, as opposed to the 2002 declarations, was objectively reasonable. *Id.* at 993. The district court explained that "[t]his factual determination was also critical to the trial court's evaluation of [Marks's] three expert witnesses," and the "trial court ultimately found the experts less than credible because they" relied heavily on the 2002 declarations. *Id.* Accordingly, the district court held that the trial court's two factual findings were objectively reasonable considering the record as a whole. *Id.*

We look to the underlying state trial court's ruling. *See Wilson v. Sellers*, 584 U.S. 122, 125 (2018) ("federal court should 'look through' [a summary denial] to the last related state-court decision that does provide" a reasoned decision). I agree with the district court that the trial court's factual determinations were objectively reasonable.

## II

It is undisputed that AEDPA applies here. Under AEDPA, habeas relief is unavailable unless the state court's adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The majority vacates the federal district court's ruling on Marks's *Atkins* claim under

prong (2) of 2254(d).  The plain text and legislative purpose of AEDPA, as well as prior precedent, however, preclude such a result.  There is also ample evidence to support the district court's determination of the facts as reasonable.

## A

To find that a state court's decision is "based on an unreasonable determination of the facts," § 2254(d)(2), a federal court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record before the state court," *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014) (internal quotation marks omitted).  The factual determination must also have influenced the decision "in some material way."  *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004), *abrogation on other grounds recognized by Murray v. Schriro*, 745 F.3d 984, 999–1000 (9th Cir. 2014); *see also* § 2254(d)(2) (federal court may reverse only where the state court's decision was "*based on* an unreasonable determination of the facts") (emphasis added).  This court must also be "particularly deferential" to the state court where it is reviewing its fact-finding process. *Weaver v. Palmateer*, 455 F.3d 958, 963 n.6 (9th Cir. 2006) (internal quotation marks and citations omitted).

The majority holds the state court's *Atkins* decision was based on an "unreasonable determination of the facts."  Maj. at 91–97.  The majority properly rejects alleged factual errors regarding Dr. Gur and the lay witnesses.  *Id.* at 76–91. But the majority identifies two other "errors" related to Drs. Woods and Cowardin.  *Id.* at 91–97.  The majority points to the trial court's statement that Dr. Woods had not reviewed the 1994 testimony, when, in fact, he testified that he had. *Id.* at 96–97.  And the majority notes that the trial court

mischaracterized part of Dr. Cowardin's testimony. *Id.* at 93–96. Dr. Cowardin at first told the trial court that she was not using the AAMR's clinical definition of intellectual disability, but that she "made up" the definition she cited. But she later clarified that she had accurately quoted the AAMR definition. The trial court, nonetheless, stated that Dr. Cowardin had used the incorrect definition and did not mention her clarification when discussing her credibility.

The majority concludes that these two technical misstatements by the trial court satisfy § 2254(d)(2). But "[t]he question under AEDPA is . . . not whether a federal court believes the state court's determination was incorrect, but whether that determination was unreasonable." *Shoop v. Twyford*, 596 U.S. 811, 819 (2022). In *Taylor*, we held that "[f]ailure to key consider aspects of the record is a defect in the fact-finding process." 366 F.3d at 1008. "How serious the defect, [however], depends on what bearing the omitted evidence has on the record as a whole." *Id.*; *see also id.* at 1007 ("the philosophy of our common-law fact-finding process [is] that the various pieces of evidence and testimony in the record must be considered in light of all the others"). Thus, a state court's misstatement "render[s] the resulting factual finding unreasonable," only where it "goes to a material factual issue that is central to petitioner's claim." *Id.* at 1001. A properly deferential analysis establishes that the trial court's technical misstatements were not material and capable of rendering its credibility determinations "objectively unreasonable," *see* Maj. 91–97, but were inconsequential.

The trial court engaged in a "dynamic, holistic [fact-finding] process" in concluding that both Dr. Cowardin's and Dr. Woods's testimony should be discredited as irreconcilable with the 1994 testimony. *See Taylor*, 366 F.3d

at 1007. First, for Dr. Cowardin, the trial court found her decision to rely upon a definition of intellectual disability that used the word "manifest," as opposed to "originate," as required by section 1376, constituted "[a] surprising example of lack of impartiality and of partisanship." The trial court thought this was part of a deliberate strategy on the defense team's part to "conceal or ignore" the 1994 testimony. The motive was clear: if Marks had to demonstrate that his intellectual disability "manifested" before age eighteen, then the most reliable evidence of his childhood—the 1994 testimony—would have been most probative. And that 1994 testimony strongly suggested, if not demanded, that the trial court rule against Marks because it was inconsistent with a finding that his intellectual disability was "easily understood and recognized" before age eighteen. Thus, the fact that the trial court did not mention Dr. Cowardin's clarification on the record of the AAMR definition could not possibly be a "material subsidiary fact" because it has no bearing whatsoever on whether she engaged in this deceptive and disqualifying strategy.

Likewise, for Dr. Woods, the trial court found he lacked credibility because he ignored the 1994 live testimony. The majority argues that the trial court offered two reasons for discrediting Dr. Woods—that he relied on the 2002 declarations and did not review the 1994 testimony—and that the former without the latter would have been insufficient to reject him. Maj. 92–93. But given that the trial court found the 2002 declarations to be demonstrably false considering the 1994 testimony, the fact that he reviewed both is even more consistent with his participation in a deliberate and concerted effort to "conceal or ignore"

the testimony, not less.  This is because the 1994 testimony directly undermined his findings.

The majority's position that the trial court's "error" was material because Dr. Woods otherwise relied on other less probative information, *see* Maj. 92–93, cannot support habeas relief.  The only other information that Dr. Woods relied upon to conclude that Marks had subaverage adaptive functioning before age eighteen was the 2002 declarations.[1] But the majority agreed that the trial court's decision to reject these declarations, because they directly conflicted with the 1994 testimony, was objectively reasonable.  Maj. 90–91.  In that light, the majority's assessment that the trial court was objectively unreasonable for rejecting Dr. Woods's testimony for heavily relying on these same declarations is not supported by the record.

## B

The majority recites and affirms other evidence assessed by the trial court.  The majority, however, ignores that this other evidence fully supports the trial court's determination. For example, the non-expert evidence alone supports the trial court's finding that Marks did not meet his burden of proof, which was dispositive as a matter of state law.  *See,*

---

[1] The other probative information that the majority cites either relates to the issue of whether Marks had subaverage intellectual functioning before age eighteen (i.e., his school records and IQ scores) or concerned evidence of Marks's brain functioning impairment that did not manifest until adulthood.  As Dr. Woods's report explained, Marks's family observed a significant change in him after his return from the Navy, which they attributed to his "increasing drug use and some unknown event that occurred during his years of service."  After that, Dr. Woods described Marks's subsequent mental deterioration in adulthood, of which he suggests casual factors may have originated in Marks's childhood.

*e.g.*, *Hawthorne*, 105 P.3d at 554. The trial court was also justified in rejecting Marks's experts on multiple other independent bases, including that the experts' decision to rely on the 2002 lay declarations was suspect. While the majority affirms these other bases, it fails to explain why these grounds independently do not support the trial court's findings. *See* Maj. at 90–91.

This approach is wrong. The Supreme Court has held that "a federal court must carefully consider *all* the reasons and evidence supporting the state court's decision." *Mays v. Hines*, 592 U.S. 385, 391 (2021) (emphasis added). This includes "rebutting" all the trial court's "justifications." *Id.* at 391–92. The appellate court must also give the trial court the "benefit of the doubt" with respect to those reasons. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). Properly applying this precedent, the record as a whole supports the trial court's twin factual determinations.

Finally, the majority's approach also conflicts with the purpose of AEDPA. Congress enacted AEDPA "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and to advance the principles of comity, finality, and federalism." *Shoop*, 596 U.S. at 818 (internal citations and quotation marks omitted). The majority violate these principles. It obfuscates the underlying rationale in the state court's rejection of Marks's *Atkins* claim, which involved a question of fact under state law. And it sends this aging case back to the district court even though the state court's factual determinations were not truly "objectively unreasonable." This is improper. I dissent.